UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

CASE NO. 05-11830-NMG

| | |
|---|---|
| JOYCE CHRISTIE. | ) |
| | ) |
|       Plaintiff | ) |
| | ) |
| V. | ) |
| | ) |
| HARTFORD LIFE GROUP INSURANCE | ) |
| COMPANY | ) |
| | ) |
|       Defendant | ) |

**MEMORANDUM IN SUPPORT OF
PLAINTIFF, JOYCE CHRISTIE'S OPPOSITION TO
DEFENDANT'S MOTION FOR A RULE 35 EXAMINATION
OF THE PLAINTIFF, JOYCE CHRISTIE**

**I.**        **INTRODUCTION**

This is an action to recover long term disability benefits under an individual insurance policy. The plaintiff brought this action under theories of breach of contract and violation of Massachusetts G. L. c. 176D and 93A.

Plaintiff, Joyce Christie ("Ms. Christie")opposes the defendant's, Hartford Life Group Insurance Company f/k/a/ CNA Group Assurance Company ("Defendant"), motion requiring her to undergo a physical examination by Dr. Walter Panis, M.D. The Defendant's motion should be denied, because the Defendant cannot meet its burden under Rule 35 of F.R.C.P.

The Defendant materially breached its contract with Ms. Christie to provide disability benefits. Under the terms of that insurance contract, the Defendant had the opportunity to require Ms. Christie to be examined by a medical doctor of its choice. The Defendant forfeited that

privilege by wrongfully denying benefits to Ms. Christie.

Years before this litigation commenced, the Defendant elected to deny benefits to Ms. Christie without ever having had her medical records reviewed by a medical doctor, or having her examined by a medical doctor. Instead, nonqualified claims employees denied Ms. Christie's application for benefits.

Now facing the reality that it did not have adequate grounds to deny her claim in light of overwhelming medical opinions that Ms.Christie delivered to the Defendant pre-suit, the Defendant looks to this Court for help to enforce the terms of the contract. The Defendant, however, continues to contend that its denial was correct.

This Court should not countenance the Defendant's material breach of contract, yet at the same time, reward it by allowing it to conduct a medical examination under Rule 35 of F.R.C.P. Permitting a Rule 35 examination would encourage insurance companies to deny benefits without conducting a medical exam and then look to the Court for assistance once litigation commences.

## II.        <u>DEFENDANT REPEATEDLY DENIED THE BENEFITS CLAIM.</u>[1]

In April, 2001 Ms. Christie was injured in an automobile collision.   After a period of time she returned to work.  However, she never fully  recovered from that collision.   On August 20, 2002, her employer, the Fall River Housing Authority instructed Ms. Christie not to return to work because she was unable to perform the material and substantial duties of her occupation as required by her employer, as a result of a physical injuries.  Ms. Christie's inability to perform on a continuous basis, the material and substantial duties of her occupation was supported by

---

[1]The factual statements are reasonably believed to be uncontested when not supported by factual references in the record.

opinions of treating medical doctors.  At the time the material and substantial duties of Ms.

Christie's occupation included but were not limited to:

     a.  working in front of a computer 2-4 hours per 6 ½ hour day;

     b.  being able to lift 20 lbs from waist to floor and waist to waist on a frequent basis;

     c.  being able to climb 30 stairs each day for a total of 1 hour per 6 ½ hour day;

     d.  being able to work both standing and seated for 2 hours at a time;

     e.  being able to type 50 words per minute.

Ms. Christie's doctors opined that she was unable to perform the material and substantial

duties of her occupation on a regular sustained basis, due to degenerative disk decease

compounded by a motor vehicle accident and other attendant health problems.

Ms. Christie filed a claim for disability benefits with the Defendant during the later

portion of 2002. The Defendant denied her application on February 3, 2003.    Thereafter, Ms.

Christie appealed the Defendant's denial.

On April 25, 2003, the Defendant again denied benefits. In denying the claim on April

25, 2003, the Defendant wrote to Ms. Christie's then attorney, in part, "a comprehensive review

of her appeal for disability benefits has been completed and we have determined that the

Company's decision to deny her long term disability benefits was proper and correct based on

the information received and review." The Defendant never requested that  Ms. Christie by

examined by a medical doctor of the Defendant's choice; nor did the Defendant have Ms.

Christie's medical records reviewed by a medical doctor selected or employed by the Defendant.

Ms. Christie retained new counsel. On March 28, 2005 Ms. Christie sent a  demand letter

under Massachusetts G. L. c. 176D and c. 93A  accompanied by approximately five hundred

(500) pages of medical records burned to a CD-ROM[2], vocational records and workers' compensation relating to her claim. The letter was promptly received by the Defendant, yet it elected not to respond. When the Defendant's Rule 30(b)(6) deponent was asked why the Defendant never answered the letter it responded "because the claim file had been closed."

Q.   Why didn't the Hartford or CNA respond to Exhibit 2?
A.   Because our position was the claim file had been closed in April, 2003.
Q.   Any other reasons that the Hartford or CNA didn't respond?
A.   No.
A.   Have you ever looked at, up to the current time, have you ever looked at the medical documents that were on the CD-ROM?
A.   No.
Q.   Is there a particular reason that you didn't.
A.   No, once the claim went into litigation, the CD-ROM was attached to this letter and everything was sent.  I never looked at the CD-ROM.  Just remember that acknowledging by my initials here this letter, but actually probably did not even review the letter. ( EXHIBIT B, Rule 30(b)(6) Deposition pages 115-116).

## III.     MATERIAL INSURANCE POLICY PROVISIONS.[3]

Under the terms of the Defendant's insurance policy, disability is defined as follows:

How do we define *Disability?*

*Disability* or *Disabled* means that You satisfy the Occupation Qualifier or the Earnings Qualifier as defined below.

Occupation Qualifier

*Disability* means that during the *Elimination Period* and the following 24 months, *Injury* or *Sickness* causes physical or mental impairment to such a degree of severity that You are:

1) continuously unable to perform the *Material* and *Substantial Duties* of *Your Regular Occupation*; and
2) no *Gainfully Employed.*

---

[2]Exhibit A is a copy of the plaintiff's automatic disclosures. The identity of the vast majority of the medical doctors and their records were sent with the 93A demand letter presuit.

[3]These definitions are quoted from the insurance policy and are not expected to be disputed by the Defendant.

After the *LTD Monthly Benefit* has been payable for 24 months, *Disability*, means that *Injury* or *Sickness* causes physical or mental impairment to such a degree of severity that You are:

> 1) continuously unable to engage in any occupation for which You are or become qualified by education, training or experience; and
> 2) not *Gainfully Employed*

EXAMINATION
At Our expense, We have the right to have You examined as often as reasonably necessary while the claim continues. Failure to comply with this examination may deny, suspend or terminate benefits, unless We agree You have valid and acceptable reason for not complying.

## IV.      DEFENDANT'S REQUEST FOR A RULE 35 EXAMINATION MUST BE DENIED BECAUSE IT CANNOT SHOW "GOOD CAUSE".

The Defendant has not alluded to any law developed under Rule 35 that would be applied to a breach of contract action. In fact, the case law supports the opposite conclusion. As a breach of contract action, a Rule 35 examination is inapplicable. The plaintiff's claim principally lies in the nature of breach of contract and statutory damages for unfair insurance practices. Damages are sought for that breach and for statutory violations only. Therefore, Ms. Christie's condition is "not in controversy" as contemplated by Rule 35.

The substantive predicates for a Rule 35 medical examination cannot be met by mere conclusory allegations nor by simple reference to case law permitting medical examinations in tort cases. Here, the Defendant not only fails to demonstrate it is entitled to have Ms. Christie examined under Rule 35, but its decision to deny her benefits under the insurance policy also resulted in a waiver of such rights that it might have had to conduct a medical examination. Schlagenhauf v. Holder 379 U.S. 104 (1964) (each case requires a "discriminating application by the trial judge, who must decide as an initial matter in every case, whether the party . . . has adequately demonstrated the existence of the Rule's requirements").

Ms. Christie alleges that the Defendant breached its contract of insurance with Ms. Christie, because it improperly denied her claim for disability benefits.   The  relevant evidence is whether the Defendant properly investigated the claim and correctly denied it.   This Court should not permit the Defendant to obtain new evidence some 3 plus years later after its final claim denial in an attempt to shore up its claim record. The insurer was provided a clear chance prior to the commencement of the suit, yet elected not to review Ms. Christie's medical and vocational records.

Defendant's motion exposes its motivation in seeking a Rule 35 examination:

**In order to defend this action, Defendant is entitled to obtain evidence of plaintiff's true physical condition, any restrictions she may have, as well as the extent of her functionality and work capacity." (Defendant's motion p. 3, ¶2).**

These are issues that the Defendant should have looked into before denying Ms. Christie's claim for disability benefits. Defendant had the opportunity in 2003, and then was granted another statutory chance to review the records and requiest an exam of Ms. Christie when it received the G. L. 93A demand letter within days after March 28, 2005.

**B.    A Breaching Party May Not Invoke The Terms of a Contract for its Benefit.**

"[It is well established that a material breach by one party excuses the other party from further performance under the contract."Ward v. American Mut. Liab. Ins. Co., 15 Mass.App.Ct. 98, 100, 443 N.E.2d 1342 (1983); See also Restatement (Second) of Contracts § 241 (1981)[4].

---

[4]Section 241  provides: "In determining whether a failure to render or to offer performance is material, the following circumstances are significant: (a) the extent to which the injured party will be deprived of the benefit which he reasonably expected; (b) the extent to which the injured party can be adequately compensated for the part of that benefit of which he will be deprived; ©) the extent to which the party failing to perform or to offer to perform will

Repudiation by one party relieves the other party from further performance, but such repudiation " 'must be a definite and unequivocal manifestation of intention [not to render performance].' " Thermo Electron Corp. v. Schiavone Constr. Co., 958 F.2d 1158, 1164 (1st Cir.1992) (quoting 4 Arthur L. Corbin, *Corbin on Contracts* § 973, at 905-06 (1951)).

Insurance contracts follow this general principle from the maxim that "the law does not compel a man to do a useless act."[5] In the context of insurance contracts, a coverage denial waives an insured's duty to comply with contract conditions precedent such as submission to examinations, satisfaction of proof of loss requirements, notice, arbitration, preservation of subrogation rights and other contract requirements. See, Hurley v. First UNUM Life Ins. Co., 24 A.D.3d 509, 808 N.Y.S.2d 247 (2005) (insured did not breach duty to cooperate under policy by refusing to submit to additional electromyelograph study after insurer terminated benefits) ; See also Finkelstein v. Equitable Life Assur. of America, 11 N.Y.S.2d 135 , 256 A.D. 593 (1939) (insurer had no right to medical examination of insured once it denied claim for disability benefits).

Typical of the many cases reflecting the general rule that insurance companies have no contractual right to compel examinations of insureds following a denial of coverage is Finkelstein v. Equitable Life Assur. Soc. of the U.S., 256 App. Div. 593,11 N.Y.S. 2d 135 (1939). In Finkelstein, an insured sued to recover disability benefits under five life insurance policies and one health insurance policy. As a defense, the insurer claimed the life policies

_____

suffer forfeiture; (d) the likelihood that the party failing to perform or to offer to perform will cure his failure, taking account of all the circumstances including any reasonable assurances; (e) the extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing."

[5]See Williston on Contracts, Third Edition, Section 699 at 344-348 (in other words, a condition's performance is excused when it is obvious another party is not going to keep its promise to perform regardless of whether the condition is performed.)

required "proof" of continued disability and cited the insured's refusal to submit to additional physical examinations. The Court held that the insured's refusal was no defense. Id. at 138. The policy gave the insurer the right to require submission to further examinations only during the pendency of a claim. Following the insurer's rejection of a claim, there was no right to a physical examination. Id. at 138-139. In Hurley, the Court looked to Finkelstein and held that the insured did not breach the contract by failing to undergo an examination after the insurer refused to pay disability benefits. A similar analysis applies to the instant action.

### 1.    **Defendant Materially Breached the Insurance Contract.**

A request for a medical examination under Rule 35 does not correct the insurer's failure to exercise a contract right.[6] Here, the right to request a medical examination was a right which Defendant chose not to pursue prior to denying benefits. The Defendant refused to pay benefits to Ms. Christie. Having breached the contract, the Defendant cannot claim the fruits of that same contract,  including the privilege to have Ms. Christie examined by a medical doctor of its choice.

Pretending that it has not materially breached the contract, the Defendant is trying to take unfair  advantage of Rule 35.   If the Defendant really believed that it had all the appropriate information at hand when it denied Ms. Christie's claim, then a question must be asked, why does the Defendant want an examination to be done by a medical doctor at this time?  The answer is quit clear: Defendant knows that after Ms. Christie deposed the Defendant's Rule

---

[6]See Couch on Insurance 2d, Section 49A:354-363 at 764 (medical examination provisions are for the benefit of the insurer and may be waived by it by a denial of liability); Finkelstein v. Equitable Life Assur. of America, supra (insurance company had no right to a medical exam after it denied insured benefits under disability policy).

30(b)(6) witness that its denial of the claim in the first instance was wrong.  The Defendant denied the claim without having Ms. Christie or examined, or having her medical records reviewed by a medical doctor. Instead, claims people decided that all of Ms. Christie's doctors were wrong, and they were correct.Defendant seeks the assistance of this Court in allowing it to conduct an examination after a fact.   Such a tactic is improper under the terms of the insurance policy and particularly this case; Rule 35 should not be allowed as a method to relieve the Defendant of its breach.

The Defendant made its decision to deny Ms. Christie's benefits twice in 2003, and then when presented with another opportunity in March of 2005, it did the same.  Without question, prior to its final decision, the Defendant had a contractual right under the insurance policy to request a medical examination.   The Defendant, however, never chose to avail itself to having such an examination prior to concluding that Ms. Christie is not disabled. Instead of requesting such an examination, the Defendant relied on its employees and did not even consult with one medical doctor. It decided that her file had been appropriately reviewed and there was sufficient ground to deny benefits at alll times. Now it wants to shore up its prior decision.

Indeed, it would be fundamentally unfair if Rule 35 of F.R.C.P. was turned into a conduit for enjoying the rights under a contract while at the same time having denied the contract to the receiving party.   Once the Defendant breached the contract by denying coverage, Ms. Christie filed this suit seeking to prove that the Defendant's conduct was wrongful and in bad faith.  Now in the guise of a Rule 35 motion, the Defendant is asking this Court to assist the in its breach of contrac after the fact by requiring Ms. Christie to undergo an examination.  For the Court to permit such a medical examination at this time is tantamount to ruling that even though the Defendant has not paid Ms. Christie benefits for more than 3 years, it still has contractual rights

under the insurance policy that advantage the insurer and hurt Ms. Christie.   The Defendant

made its decision not to pay benefits without the benefit of an examination that was permitted

under the policy.  The Defendant should not be allowed to defend its denial by obtaining new

evidence through a physical exam.  To permit any medical examination at this time is

fundamentally wrong.

In seeking the Rule 35 examination, the Defendant is attempting to reverse engineer its

way back into a tenable defense position.  Having already denied Ms. Christie benefits under her

insurance policy, the Defendant is now seeking to bolster its defense through this Rule 35

examination.  This is not "good cause" as contemplated by the Rule and is indicative that the

examination is sought for motives that are not within the parameters of Rule 35.  Without doubt,

the Defendant should have gathered its expert medical opinions as well as compliance with all

policy conditions prior to its denial of benefits.   Now faced with the same unrefuted medical

evidence that was available to the Defendant prior to commencement of this suit, the Defendant

looks to this Court for support and an opportunity to bolster its claim denial.

## CONCLUSION

For these reasons, the Defendant's motion should be denied. In the alternative, the relief

sought by the plaintiff in her opposition should be allowed.

RESPECTFULLY SUBMITTED,
JOYCE CHRISTIE,
By her attorney

*/s/ Jonathan M. Feigenbaum*

Jonathan M. Feigenbaum, Esq.
B.B.O. #546686
Philips & Angley
One Bowdoin Square
Boston, MA 02114
Tel. No. : (617) 367-8787

CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing. (NEF), and paper copies will be sent to those indicated as non-registered participants on September 4, 2006.

*/s/ Jonathan M. Feigenbaum*

L:\LITG\Jchr001\Exam Motion\final\MEMO.RULE35.wpd

EXHIBIT A

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

CASE NO. 05-11830-NMG

| | |
|---|---|
| JOYCE CHRISTIE. | ) |
|     Plaintiff | ) |
| | ) |
| V. | ) |
| | ) |
| HARTFORD LIFE GROUP INSURANCE COMPANY | |
|     Defendant | |

## PLAINTIFF'S RULE 26(a) DISCLOSURES

NOW COMES the plaintiff and makes Automatic Required Disclosures in accordance

with Rule 26(a)(1) of Fed.R.Civ.P., and Rule 26.2 of the Local Rules of the United States

District Court for the District of Massachusetts as follows:

(**A**) **Individuals Having Discoverable Information in Support of Claims**.

1.    John Does and Jane Does of CNA Insurance, k/n/a The Hartford, P.O. Box 299, Hartford, CT 06141-0299.

    CNA and The Hartford have information relating to the claim and denial of benefits.

2.    Record keepers at Fall River Housing Authority, 85 Morgan Street, P.O. Box 989,Fall River, MA 02722, Tel: (508) 675-3500.

    Fall River Housing Authority has information relating to earnings of the plaintiff and requirements of her occupation.

3.    Department of Industrial Accidents (DIA), 8 Austin Street, Worcester, MA 01609, Tel: (508) 753-2072.

    DIA has information regarding it ordering payments to plaintiff for work related injuries.

2

4.    Commonwealth of Massachusetts, PERAC, 5 Middlesex Avenue, 3rd FloorSomerville, MA 02145, Tel: (617) 666-4446.

PERAC has medical records regarding the plaintiff.

5.    Saint Anne's Hospital, 795 Middle Street, Fall River, MA 02721, Tel: (508) 674-5741.

This hospital has medical records of the plaintiff.

6.    Shields MRI, 313 Faunce Corner Road, Dartmouth, MA 02747, (800) 258-4674.

Shields has films of plaintiff.

7.    Dr. John Piva, DO, 1565 North Main Street, Fall River MA 02720, Tel:  (508) 675-0369.

Dr. Piva treated plaintiff and has knowledge with respect to plaintiff s medical condition and her restrictions and limitations.

8.    Dr. John Markman, MD, MGH, 32 Fruit Street, Boston, MA 02114, Tel: (617) 724-2777.

Dr. Markman treated  plaintiff and has knowledge with respect to plaintiff s medical condition and her restrictions and limitations.

9.    Dr. Subu Magge, MD, Lahey Clinic, 41 Mail Road, Burlington, MA 01805, Tel: (781) 744-5100.

Dr. Magge treated plaintiff and has knowledge with respect to plaintiff's medical condition and her restrictions and limitations.

10.    Dr. Edward Tarlov, MD, Lahey Clinic, 41 Mail Road, Burlington, MA 01805, Tel: (781) 744-5100.

Dr. Magge treated plaintiff and has knowledge with respect to plaintiff s medical condition and her restrictions and limitations.

11.    Dr. Rusch, MD, formerly of the Lahey Clinic, 41 Mail Road, Burlington, MA 01805, Tel: (781) 744-5100.

Dr. Rusch  read films of plaintiff.

12.    Dr. Andrea C. Misquitta, MD, formerly of Shields MRI, 313 Faunce Corner Road, Dartmouth, MA 02747, (800) 258-4674.

       Dr. Misquitta read films of plaintiff.

13.    Dr. Murray, Dimant, MD, Saint Anne's Hospital, 795 Middle Street, Fall River, MA 02721, (508) 674-5741.

       Dr. Dimant read films of plaintiff.

14.    Dr. Carlos Caceras, MD, formerly of  Brigham and Womens Hosp., 75 Francis Street, Boston, MA 02115.

       Dr. Caceras read films of plaintiff.

15.    Dr. Jonathan L. Streeter, MD, Brigham and Womens Hosp., 75 Francis Street, Boston, MA 02115, Tel: (617) 278-0702

       Dr. Streeter read bone scans of plaintiff.

16.    Dr. Rami R. Rustum, MD formerly of Brigham and Women's Hosp., now of Lawrence General Hospital, Pain Clinic, L4 - 1, Lawrence, MA 01841, Tel:(978) 683-4000

       Dr. Rustum performed epidural injection to treat plaintiff's back pain.

17.    Dr. James Broome, MD, 511 West Grove Street, Suite 104, Middleboro, MA 02346, Tel: (508) 947-2384.

       Dr. Broome performed a record review in connection with a worker's compensation claim.

18.    Dr. Joseph Doerr, MD, 67 G.A.R. Highway, Somerset, MA 02725, Tel: (508) 673-9400.

       Dr. Doerr treated plaintiff and has knowledge with respect to plaintiff s medical condition and her restrictions and limitations.

19.    Dr. Claude Curran, MD, 198 Hanover Street, Fall River, MA 02770, Tel: (508) 672-1444.

       Dr. Curran treated plaintiff and has knowledge with respect to plaintiff s medical condition and her restrictions and limitations.

20.    Dr. Yvonne Rizk, MD, 49 State Road, N. Dartmouth, MA 02747, Tel: (508) 996-2273.

Dr. Rizk treated plaintiff and has knowledge with respect to plaintiff's medical condition and her restrictions and limitations.

21.    Dr. Harry E. VonErtfelda, M.D., 84 Grape Street, New Bedford, MA 02740, Tel: (508) 992-4024

Dr. VonErtfelda treated  plaintiff and has knowledge with respect to plaintiff's medical condition and her restrictions and limitations.

22.    Dr. Gregory Brick, M.D., Brigham and Womens Hosp., 75 Francis Street, Boston, MA 02115, Tel: (617) 732-5322

Dr. Brick treated plaintiff and has knowledge with respect to plaintiff's medical condition and her restrictions and limitations.

23.    Dr. Edward Michna, M.D., Brigham and Womens Hosp., 75 Francis Street, Boston, MA 02115,  Tel: (617) 732-6708

Dr. Michna treated plaintiff and has knowledge with respect to plaintiff's medical condition and her restrictions and limitations.

24.    Dr. Douglas R. Johnson, M.D., Southeast Rehabilitation Associates, PC, 363 Highland Avenue Fall River, MA 02720, Tel: (508) 679-7156

Dr. Johnson treated plaintiff and has knowledge with respect to plaintiff's medical condition and her restrictions and limitations.

25.    Dr. Derbyshire Bruce Derbyshire, M.D., P.O. Box 128, Adamsville, RI 02801, Tel: (508) 636-4296

Dr. Derbyshire examined and evaluated plaintiff in connection with a benefits claim.

26.    Dr. Andrew Mazur, M.D., Southcoast Wellness Center 250 Faunce Corner Road N. Dartmouth, MA 02747, Tel: (508) 984-7226

Dr. Mazur treated plaintiff and has knowledge with respect to plaintiff's medical condition and her restrictions and limitations.

27.    Dr. Nancy R. Dempsey, D.C., 122 Plymouth Avenue, Fall River, MA 02721, Tel: (508)

674-7707

Dr. Dempsey treated plaintiff and has knowledge with respect to plaintiff's medical condition and her restrictions and limitations.

28.    Dr. David Bullis, MD and Nancy Furtado, PAC Coastal Orthopedics 235 Hanover Street Fall River, MA 02720

Dr. Bullis and Ms. Furtado treated plaintiff and has knowledge with respect to plaintiff's medical condition and her restrictions and limitations.

29.    Jeannie Crabtree, A.N.P., The Family Health Care Center 400 Stanley Street Fall River, MA 02720,  Tel: (508) 675-1054

Ms. Crabtree treated plaintiff and has knowledge with respect to plaintiff's medical condition and her restrictions and limitations.

30.    Joyce Christie, c/o Jonathan M. Feigenbaum, Esq. Phillips & Angley One Bowdin Square Boston, MA 02114 Tel: (617) 367-8787

Plaintiff has knowledge with regard to her medical condition, occupation and inability to be gainfully employed.


**(B) Description of Documents in Support of Claims**

Various medical and vocational records that were delivered to The Hartford on March 31, 2005. Plaintiff will execute reasonable medical releases so defendant may obtain copies of records.

**( C) Damages**

Plaintiff states that she is seeking damages in an amount to be proved at trial on each

count. In addition, plaintiff seeks attorneys' fees and costs allowed by statute or common law or

court rule.




**(D) Insurance Agreements**

6

None.

These disclosures are based upon information reasonably available to plaintiff at this time.  Plaintiff reserves the right to assert applicable privileges and protections with respects to documents and information which the defendant may seek as a result of these voluntary disclosures.

JOYCE CHRISTIE,

_____
Jonathan M. Feigenbaum, Esq.
B.B.O. #546686
Philips & Angley
One Bowdoin Square
Boston, MA 02114
Tel. No. : (617) 367-8787

L:\LITG\Jchr001\Exam Motion\final\Exhibit A.wpd

EXHIBIT B

```
 1                UNITED STATES DISTRICT COURT

 2                 DISTRICT OF MASSACHUSETTS

 3

 4    JOYCE CHRISTIE,              )

 5          Plaintiff,            )

 6    VS.                         )   No. 05-11830 NMG

 7    HARTFORD LIFE GROUP INSURANCE)

 8    COMPANY as successor to CNA  )

 9    GROUP LIFE ASSURANCE COMPANY,)

10          Defendant.            )

11

12

13

14

15        DEPOSITION OF CHERYL SAUERHOFF, a witness called

16    on behalf of the Plaintiff, pursuant to the

17    Massachusetts Rules of Civil Procedure, before

18    Esmeralda Guzman, a Certified Shorthand Reporter and

19    Notary Public in and for the State of Connecticut,

20    taken at The Simsbury Inn, Simsbury, Connecticut,

21    taken on May 18, 2006, commencing at 10:02 a.m.

22

23

24
```

```
 1                    APPEARANCES

 2

 3    JONATHAN M. FEIGENBAUM, ESQUIRE

 4    Phillips & Angley

 5    One Bowdoin Square, Suite 300

 6    Boston, Massachusetts  02114

 7    (617) 367-8787

 8         Counsel for Plaintiff

 9

10    KATHERINE R. PARSONS, ESQUIRE

11    Crevier & Ryan, LLP

12    1500 Main Street

13    Springfield, Massachusetts  01115

14    (413) 787-2400

15         Counsel for Defendant

16

17    Also Present:

18    Sandra K. Davis

19

20

21

22

23

24
```

1                          INDEX

2

3    WITNESS:      CHERYL SAUERHOFF

4

5    EXAMINATION BY:                          PAGE

6    Mr. Feigenbaum                           4

7

8

9

10

11

12                        EXHIBITS

13   NUMBER                                   PAGE

14     1      Notice of Deposition           4

15     2      March 28, 2005 Letter          4

16     3      E-mail                          4

17     4      Claim File                      4

18     5      Printout                        4

19

20   (Exhibits retained.)

21

22

23

24

```
 1                        STIPULATIONS

 2              It is hereby stipulated and agreed by and

 3      between counsel for the respective parties that the

 4      witness will reserve her right to read and sign the

 5      deposition transcript within 30 days.  If not, it

 6      will be deemed accurate.

 7              It is further stipulated and agreed that all

 8      objections except as to the form of the question and

 9      all motions to strike shall be reserved until the

10      time of trial.

11

12                    (Exhibits 1, 2, 3, 4, 5, Notice of

13                    Deposition, March 28, 2005 Letter,

14                    E-mail, Claim File, Printout, marked

15                    for identification.)

16

17      (Cheryl Sauerhoff, having been duly sworn by the

18      notary public, was examined and testified as

19      follows.)

20

21                        EXAMINATION

22      BY MR. FEIGENBAUM:

23          Q.  Would you state your full name.

24                    MR. FEIGENBAUM:  Or let me do
```

```
 1              this.  Stipulations, is this agreeable

 2              with you, that reserve all objections

 3              except as to form, reserve motions to

 4              strike.  The deponent will have thirty

 5              days from receipt of the deposition to

 6              read and sign.  And if it's not signed

 7              within that time period, if it's not

 8              signed within that time period, it'll

 9              be deemed signed.  Is that agreeable?

10                   MS. PARSONS:  Agreed.

11                   MR. FEIGENBAUM:  Agreed.

12         Q.  (By Mr. Feigenbaum)  Would you state your

13    full name, please.

14         A.  Cheryl Sauerhoff.

15         Q.  Where are you employed?

16         A.  The Hartford.

17         Q.  What location?

18         A.  In Maitland, Florida.

19         Q.  And you understand today that you're under

20    oath in the same way as if you took an oath in the

21    courtroom?

22         A.  Yes.

23         Q.  Is there -- are you suffering from any

24    impediment today that would prevent you from giving
```

1    your best answers to my questions?

2        A.   No.

3        Q.   How many times have you been deposed before?

4        A.   I believe 45.

5        Q.   When was the last time you were deposed?

6        A.   In January.

7        Q.   Was that as a 30(b)(6) witness for The

8    Hartford?

9        A.   Yes.

10        Q.   And in connection, what was -- what was that

11    case?

12        A.   What do you mean by what was that case?

13        Q.   What was the name of the case?

14        A.   It was McMahon was the last name.  And Cathy

15    is the first name.

16        Q.   Where were you deposed?

17        A.   Los Angeles.

18        Q.   Prior to that, when were you last deposed?

19        A.   May have been a year prior to that.

20        Q.   Have you ever testified in court?

21        A.   Yes.

22        Q.   In connection with what matters or matter?

23        A.   Disability claims.

24        Q.   And who was your employer at that time?

1      A.  At that time, it would have been CNA

2   Insurance.

3      Q.  And how many times have you testified in

4   court?

5      A.  One.

6      Q.  What was that proceeding?  Where was it?

7      A.  Philadelphia.

8      Q.  State court or federal court?

9      A.  Federal.

10     Q.  Was it -- was that in eastern district of

11  Pennsylvania?

12     A.  Wherever Philadelphia is.

13     Q.  What was the name of that case?

14     A.  I don't remember the claimant's name.

15     Q.  How many years ago was that testimony?

16     A.  Probably four.

17     Q.  Who was the plaintiff's lawyer?

18     A.  I don't recall the plaintiff's attorney.

19     Q.  Did you get deposed in that case?

20     A.  Not that I recall.

21     Q.  Were you the -- were you the corporate

22  designee for CNA in that litigation?

23     A.  I don't believe so.

24     Q.  Prior to being deposed in January, when was

```
1    the last time you were deposed before that?

2         A.   I believe it was a year prior to that.

3         Q.   Where was that?

4         A.   That was in Maitland.

5         Q.   Was that in person or by telephone?

6         A.   In person.

7         Q.   Where was that litigation pending?

8         A.   I believe out of Alabama.

9         Q.   Federal court or state court?

10        A.   Federal.

11        Q.   What was the name of the plaintiff?

12        A.   I don't recall.

13        Q.   Who was the plaintiff's lawyer?

14        A.   I believe it was John Riley.

15        Q.   Do you know where Mr. Riley's office is, what

16   state?

17        A.   In Alabama.

18        Q.   Do you recall the name of his firm?

19        A.   No.

20        Q.   Who has custody of the depositions where you

21   have been a deponent on behalf of CNA?

22        A.   Would be the law department.  Everything that

23   we did was brought to the law department.

24        Q.   Where was the law department prior to The
```

1    Hartford acquiring CNA's long term disability

2    insurance business?

3        A.  It was located in the Maitland claims office.

4        Q.  Is there still a law department there today?

5        A.  No.

6        Q.  Do you know if your deposition transcripts

7    were sent somewhere else?

8        A.  They may have been transferred with any other

9    law matters to Simsbury, Connecticut.

10       Q.  Have you ever testified at an administrative

11   proceeding?

12       A.  No.

13       Q.  Does it make sense to you when I say

14   administrative proceeding as compared to court?

15       A.  Yes.

16       Q.  Would you consider a social security hearing

17   before an ALJ an administrative proceeding rather

18   than a court proceeding?

19       A.  Yes.

20       Q.  I heard you say you've never testified at an

21   administrative proceeding?

22       A.  Correct.

23       Q.  To prepare for today's deposition, did you

24   review any documents?

1      A.   Yes.

2      Q.   What did you review?

3      A.   The claim file and the policy.

4      Q.   Where did you review those?

5      A.   In the Maitland claims office and also in my

6   travels to the deposition.

7      Q.   And while you were reviewing those documents

8   in the Maitland office, was anyone else with you?

9      A.   Not when I was reviewing the documents, no.

10      Q.   In order to prepare for today's deposition,

11   did you speak with anyone?

12      A.   Yes.

13      Q.   Who did you speak with?

14      A.   I spoke to Tom McFadden.  I spoke to Patricia

15   LaBerge.  I spoke also to Nancy Deskins.  And then to

16   my attorney.

17      Q.   When you spoke to Mr. McFadden, was anyone

18   else present?

19      A.   No.

20      Q.   Did you speak to him in person or by

21   telephone?

22      A.   In person.

23      Q.   And what did you discuss?

24      A.   We discussed his conversations with the

```
 1      employer that he had documented, his handwritten

 2      conversation.

 3           Q.   What else did you discuss?

 4           A.   Just if he had any recollections beyond that

 5      handwritten conversation.

 6           Q.   What was his answer to that?

 7           A.   No.

 8           Q.   How long did your conversation with

 9      Mr. McFadden last?

10           A.   Less than five minutes.

11           Q.   Did you have more than one conversation with

12      Mr. McFadden in order to prepare for today's

13      deposition?

14           A.   No.

15           Q.   You said you spoke to is it Ms. LaBerge?

16           A.   Right.

17           Q.   She's a nurse?

18           A.   Yes.

19           Q.   Where did you speak to her?

20           A.   At her desk.

21           Q.   In Maitland, Florida?

22           A.   Yes.

23           Q.   When did you speak to her?

24           A.   It was Tuesday afternoon.
```

1        Q.   How long did you speak to her?

2        A.   Probably less than five minutes.

3        Q.   And what did each of you say in the

4   conversation?

5        A.   I just asked her if she had reviewed any

6   other documents outside of the claim file, the

7   medical records that she had written her summary on.

8        Q.   And what was her answer?

9        A.   She said no.

10        Q.   Was anyone else present when you had this

11   conversation?

12        A.   No.

13        Q.   Did you have more than one conversation with

14   Miss LaBerge to prepare for the deposition?

15        A.   No.

16        Q.   You said you spoke also to a Miss Deacons?

17        A.   Deskins.

18        Q.   Deskins, D-E-A-S-K-I-N-S?

19        A.   D-E-S-K-I-N-S.

20        Q.   Sorry.  When did you speak to her?

21        A.   Tuesday late afternoon.

22        Q.   Did you speak to her in person?

23        A.   No.

24        Q.   How?  Telephone?

```
 1        A.   Telephone.

 2        Q.   How long did the conversation last?

 3        A.   Probably two minutes.

 4        Q.   And what did each of you say in the

 5   conversation?

 6        A.   I just asked her if she had any recollections

 7   regarding Joyce Christie's claim file.

 8        Q.   And what was her answer?

 9        A.   No.

10        Q.   Did you have more than one conversation with

11   her regarding preparation for your deposition?

12        A.   No.

13        Q.   Are there any other employees of The Hartford

14   or formerly of CNA that you spoke with in order to

15   prepare for the deposition that you have not told me

16   about so far?

17        A.   No, just our counsel.  Nobody else.

18        Q.   You said you went over the claim file?

19        A.   Yes.

20        Q.   Can you identify in a better way how you

21   would describe the claim file that you went over?

22        A.   Well, I read the claim file in entirety which

23   is I usually start from the very back of the file

24   moving forward which is a chronological order of the
```

1    claim file.  I read the entire policy.  All the

2    attachments that were inside the claim file.

3        Q.  Approximately how many pages was the claim

4    file?

5        A.  I don't know how many pages, but it was

6    probably an inch thick or maybe a little bit more.

7        Q.  Did you look at paper or some other method

8    such as on a computer?

9        A.  No, everything was on paper.

10       Q.  That file is still physically located in

11   Maitland, Florida?

12       A.  No.

13       Q.  Where is it located?

14       A.  The claim file was sent to Simsbury,

15   Connecticut.

16       Q.  When you looked at the claim file, you were

17   looking at it in Simsbury, Connecticut rather than

18   what I mistakenly thought was in Maitland?

19       A.  No, I have a copy of the claim file that we

20   maintained when we send the original file off site.

21       Q.  All right.  You understand today as the

22   30(b)(6) deponent, you're speaking on behalf of the

23   corporation?

24       A.  Yes.

1      Q.   And do you have authority to bind the

2   corporation with your answers?

3      A.   Yes.

4      Q.   Let me show you a document that's been marked

5   as Exhibit 1.  Have you ever seen Exhibit 1 before?

6      A.   Yes.

7      Q.   When did you first see it?

8      A.   I believe it was either late last week or the

9   beginning of this week.

10      Q.   When did you first learn you were going to be

11   appearing as a 30(b)(6) deponent on behalf of The

12   Hartford?

13      A.   Actually, I think I was given notice about

14   two weeks ago.

15      Q.   Who provided that notice?

16      A.   Sandra Davis.

17      Q.   If you look at Exhibit 1, if you could turn

18   to the second page, do you see where it says Schedule

19   A?

20      A.   Yes.

21      Q.   And do you have an understanding that those

22   are the topics that I intend to make inquiry on?

23      A.   Yes.

24      Q.   Are you the person at The Hartford who's most

1    knowledgeable to speak as -- to answer questions as

2    to the factual basis for each of the defendant's

3    affirmative defenses?

4        A.  Yes.

5        Q.  Are you the person most knowledgeable at The

6    Hartford who is able to answer questions regarding

7    all reasons that The Hartford or CNA denied the

8    plaintiff's claim identified as claim number

9    244514911?

10       A.  Yes.

11       Q.  Are you the person most knowledgeable from

12   The Hartford or CNA who knows -- who can answer

13   questions as to all reasons that the defendant did

14   not respond to the letter that was attached to the

15   plaintiff's complaint?

16       A.  Yes.

17       Q.  Are you the person most knowledgeable from

18   The Hartford or CNA who can answer questions

19   regarding all occupational analysis performed by the

20   defendant in evaluating claim number 244514911?

21       A.  Yes.

22       Q.  Are you the person most knowledgeable from

23   The Hartford or CNA that can answer questions

24   regarding all medical analysis performed by The

1    Hartford or CNA in evaluating claim number 244514911?

2        A.   Yes.

3        Q.   Are you the person most knowledgeable from

4    The Hartford or CNA who is able to answer questions

5    regarding claims procedures, guidelines, or

6    instructions regarding the analysis, evaluation,

7    adjustment, and denial of claim number 244514911?

8        A.   Yes.

9        Q.   Did you take part in making the initial

10   denial of Miss Christie's claim?

11       A.   No.

12       Q.   Did you take part in, say, affirming that

13   denial when it was appealed?

14       A.   No.

15       Q.   Can you explain to me why you have more

16   knowledge on behalf of The Hartford rather than

17   Mr. McFadden, Miss LaBerge, or Miss Deacons who

18   actually made those decisions?

19              MS. PARSONS:   Objection.   We're

20          just required to provide a witness

21          that's prepared to testify on those

22          topics, and we've done that.

23              THE WITNESS:   And I believe it's

24          Miss Deskins.

1      Q.  (By Mr. Feigenbaum)  Deskins, I'm sorry,

2   okay.

3      A.  I'm familiar with the claims procedures, the

4   claims decision, the appeal decision, and all the

5   information related to Miss Christie's claim.

6      Q.  Is it correct that all of your information is

7   based on if it's not contained in the claim file, it

8   would be based on conversations you had with either

9   Mr. McFadden, Miss Deskins, or Miss LaBerge?

10      A.  No, it's not based on conversations.  It's

11   based on documentation and what's contained in the

12   claim file.

13      Q.  Do you know what the agreement is between the

14   CNA -- between CNA and The Hartford as to who is

15   financially liable if a court were to order payment

16   of the claim?

17             MS. PARSONS:  Objection.  That's

18          beyond the scope of your notice topics.

19             THE WITNESS:  No.

20      Q.  (By Mr. Feigenbaum)  How are you compensated

21   at The Hartford?  Do you receive a salary?

22             MS. PARSONS:  Objection.  It's

23          also beyond the scope of your notice

24          topics.

1              THE WITNESS:  Yes, I receive a

2         salary.

3    Q.  (By Mr. Feigenbaum)  Do you participate in

4    any type of bonus plan?

5              MS. PARSONS:  Same objection as

6         before.

7              THE WITNESS:  The company has a

8         group benefit bonus plan based on the

9         business plans.

10   Q.  (By Mr. Feigenbaum)  How does that work?

11   A.   It's divided among the shares of all the

12   businesses, and it's a company bonus that's divided

13   out among all employees.

14   Q.   What was the criteria for dividing up the

15   bonus?

16             MS. PARSONS:  I'm just going to

17        have a standing objection to this line

18        of questioning.

19             THE WITNESS:  I mean, I don't know

20        what the -- how it's determined, but

21        it's based on all the lines of

22        business, and it's called a group share

23        plan.

24   Q.  (By Mr. Feigenbaum)  Are there written

1    documents that provide instructions to you as to

2    whether or not you're entitled to a bonus?

3         A.   Well, there's communications sent out to all

4    employees about, you know, from the financial area of

5    the bonus structure, but that's my only knowledge of

6    what communication The Hartford provides.

7         Q.   Did you receive a bonus last year?

8         A.   Yes.

9         Q.   Did you receive one the prior year?

10        A.   Yes.

11        Q.   And prior to that?

12        A.   Prior to that would have been CNA and yes.

13        Q.   Was the CNA bonus plan different than The

14   Hartford?

15        A.   I think it was the same concept.  I'm not

16   sure if it's the same.

17        Q.   What is your educational background?

18        A.   I have a bachelors of art degree from the

19   University of Central Florida.

20        Q.   When did you earn that?

21        A.   In 1978.

22        Q.   Did you graduate from high school?

23        A.   Yes.

24        Q.   When was that?

1      A.   1974.

2      Q.   And do you have any formal education after

3   your earning your undergraduate degree?

4      A.   No, I took a couple post baccalaureate

5   courses, but no formal degree.

6      Q.   Do you have a degree or any type of

7   certificate in occupational analysis?

8      A.   No.

9      Q.   Do you have a degree or certificate in

10   medical evaluations?

11      A.   No.

12      Q.   After you graduated from I think you said --

13   what school in Florida was it?

14      A.   University of Central Florida.

15      Q.   After you graduated from the University of

16   Central Florida, did you go to work?

17      A.   Yes.

18      Q.   Tell me what your job history is

19   chronologically from after you graduated from college

20   to the present.

21      A.   Okay.  Actually, I worked full-time while I

22   was going to college, and it was more like retail

23   stores, Sears, things like that.  But following

24   college, it would have been I worked for Walt Disney

```
1     World from like 1974 to 1978.  From there, I worked

2     for a company called Life Concepts, and I was there

3     for about five and a half years.

4          And I believe it was in 1986 that I then was

5     employed by the State of Florida Office of Disability

6     Determinations.  I was there for about five years.

7     And in December 1991, I was employed by CNA which

8     became The Hartford on January 1, 2004.

9          Q.  What were your jobs at Life Concepts?

10         A.  At Life Concepts, I was a behavior program

11    specialist.

12         Q.  Was that the only position you held?

13         A.  Yeah, I was like a manager of a group home.

14         Q.  What is the business or function of Life

15    Concepts?

16         A.  It was a federally funded, well, it was a

17    private corporation federally funded for providing

18    various developmental training to severely and

19    profoundly developmentally disabled adults and

20    children.

21         Q.  Do you know if it's still in existence today?

22         A.  I believe the company still is, yes.

23         Q.  When you worked for Life Concepts, where was

24    it located?
```

1        A.   I worked in -- it was in Orlando, Florida.

2   That's the only location I remember.

3        Q.   And after that, you said you went to work for

4   the State of Florida Office of Disability, is it,

5   Services?

6        A.   Disability Determinations.

7        Q.   Determinations.   Is that a state agency that

8   coordinates with the Social Security Administration?

9        A.   Yes.

10       Q.   What did you do for that agency?

11       A.   I handled the disability determinations for

12   the Social Security Administration at the initial

13   level.

14       Q.   What did that job entail?

15       A.   It entailed reviewing claims that were made

16   for disability, obtaining medical information,

17   matching that criteria to see if it met the Social

18   Security Administration's criteria for disability,

19   working with a panel of doctors, reviewing

20   information.

21       Q.   Did you receive any medical impairment

22   training while you were working for that state agency

23   other than on the job?

24       A.   Well, they have when you're hired there was

1    like a twelve week class where they would have the

2    doctors, there's a panel of doctors that would come

3    in and go over all the different body systems in

4    accordance with social security.  But there was no

5    certificate.  I mean, that was pretty much the formal

6    training.

7         Q.  Were there I'll call it in-house doctors you

8    could consult with on claims while you were working

9    there?

10        A.  Yes.

11        Q.  What's the reason you left that agency?

12        A.  Well, for further advancement.  There wasn't

13   much opportunity with the state.

14        Q.  Were you a civil service employee in Florida?

15        A.  I was a state worker.

16        Q.  Where was that office located where you

17   worked?

18        A.  It was in Orlando, Florida.

19        Q.  Are you a native to the Orlando area?

20        A.  I've been there since 1970.

21        Q.  What was the first position you took at CNA?

22        A.  I was hired in as I think the title at that

23   time was disability claims examiner.

24        Q.  How did you find the position?

1     A.   I had friends who had actually worked at the

2     state agency that had moved to -- gone to CNA, and

3     there was openings at CNA.

4     Q.   What did you do as a disability claims

5     examiner?

6     A.   I handled long term disability claims for

7     national accounts in the adjudication process.   In

8     other words, when the claim was submitted, would

9     gather the medical information, review the policy,

10    and determine whether or not benefits were approved.

11    Q.   Does the term ERISA mean anything to you?

12    A.   Yes.

13    Q.   Real generally, what is your understanding of

14    ERISA?

15    A.   Well, it's the Employee Retirement Income

16    Security Act of 1974.   It's a umbrella so to speak

17    that disability plans that are governed under ERISA

18    follow.   That the claimant -- there's rights

19    protected for the claimant.   That, you know, they

20    have a full and fair review.   They're entitled to

21    know what information was obtained, how you came to

22    your conclusions, what policy provisions you relied

23    on, and then what they can do if an adverse decision

24    is rendered, what further can they do to perfect

```
 1    that.

 2         Q.  Do you know if Miss Christie's claim is

 3    governed under ERISA or state law?

 4              MS. PARSONS:  Objection.

 5              THE WITNESS:  Hers is non-ERISA.

 6         Q.  (By Mr. Feigenbaum)  How do you know that?

 7         A.  Because of her employer, Commonwealth of

 8    Massachusetts.

 9         Q.  Do you have a further understanding why her

10    claim is non-ERISA merely because she works for the

11    Commonwealth of Massachusetts?

12              MS. PARSONS:  Objection.

13              THE WITNESS:  Well, it's just my

14              understanding is that there's certain

15              agencies, typically governmental, could

16              be consultants and other avenues where

17              the person or that group may not be

18              subject to ERISA.  Also it depends on

19              how the company, if they filed, well,

20              complete and file a form 5500 for

21              ERISA.

22         Q.  (By Mr. Feigenbaum)  You used the term a few

23    minutes ago, you said full and fair review.  What

24    does that mean?
```

```
 1                    MS. PARSONS:  Objection.

 2                    THE WITNESS:  Well, that the

 3              person who rendered the original

 4              adverse decision should not be the one

 5              involved in conducting a further review

 6              of the claim.  The claimant's given the

 7              opportunity to produce all information

 8              that they feel may have been omitted

 9              and to have that independently reviewed

10              with no persuasion one way or the other

11              to the claimant or to the company.

12      Q.  (By Mr. Feigenbaum)  Do you have any further

13      understanding of what full and fair review means?

14      A.  That basically is my understanding.

15      Q.  Do you have an understanding as to whether or

16      not full and fair review applies to non-ERISA claims?

17                    MS. PARSONS:  Objection.  All

18              these questions are beyond the scope of

19              the 30(b)(6) notice, and any testimony

20              she gives is not binding on the

21              company.

22                    THE WITNESS:  Yeah, I mean, every

23              claim, whether it's ERISA or non-ERISA,

24              is given a full and fair review, so
```

1          it's not prone to one claim over

2          another.

3     Q.  (By Mr. Feigenbaum)  When you went to work at

4     CNA in 1991, did you receive any training other than

5     on the job?

6               MS. PARSONS:  Objection.  Same

7          objection.  Beyond the scope.

8               THE WITNESS:  There was a three

9          month classroom training going over

10          policies, the claim system, things like

11          that.

12     Q.  (By Mr. Feigenbaum)  At some point after your

13     first position, did you matriculate into another

14     position at CNA?

15     A.  I was promoted after almost two years to what

16     was called the senior disability specialist.

17     Q.  What was the difference between your original

18     position and that of a senior disability specialist?

19     A.  Well, I think it was an increase in case load

20     and different, probably more, I'm trying to think,

21     larger national accounts, different types of national

22     accounts.

23     Q.  And how -- were you promoted from that

24     position?

```
1        A.  I'm sorry?

2        Q.  Did you matriculate to another position after

3    senior disability -- I don't remember what you called

4    the rest.

5        A.  Claims examiner.

6        Q.  Claims examiner.

7        A.  Yeah, in 1997, I was -- it wasn't a

8    promotion.  It was a lateral move, but to appeal team

9    member.

10       Q.  And have you -- while you were still employed

11   at CNA, were you promoted from the appeal team to

12   another position?

13       A.  Yes.

14       Q.  What position was that?

15       A.  In April of 2002, I was promoted to appeal

16   team leader.

17       Q.  What did you do on the appeal team before you

18   became the appeal team leader?

19       A.  I actually had a case load, reviewed

20   disability claims, handled the appeals for those

21   claims.  As a team leader, it became more management

22   duties.

23       Q.  When in 2002 were you promoted to appeal team

24   leader?
```

1        A.   I believe it was April.

2        Q.   Were there any other appeal team leaders

3    working at CNA in April of 2002?

4        A.   Well, the -- no, it would have been a

5    director, but he had retired shortly thereafter.

6        Q.   Who was that?

7        A.   William Lorette.

8        Q.   Was that -- was Mr. Lorette a person that you

9    reported to on a organizational chart?

10       A.   Yes.

11       Q.   In 2002, what was Mr. McFadden's position at

12   CNA?

13       A.   I believe he was a disability -- probably the

14   same title that was signed on his letter, which I

15   don't recall offhand.

16       Q.   While I'm looking for that, was Mr. McFadden

17   in 2002 on an organizational chart above or below you

18   or lateral to you?

19       A.   It would probably be below.  Well, he didn't

20   report to me, but he's on the claims organization.

21   It would be below the level that I'm at.

22       Q.   I'm looking at page 52 of documents produced

23   by The Hartford and CNA.  It just says -- there's a

24   letter, for example, it says Thomas G. McFadden the

1    third, FLMI, ALHC.  Does that assist you in

2    identifying his title?

3        A.  No.

4        Q.  Do you want to see the letter?  It's page 52.

5        A.  Yes, that's his professional designation.  I

6    would venture to say that he was a disability claims

7    specialist which I believe was a title throughout

8    that time.  Yeah, it looks like his letters don't

9    include his position.  But oh, I take that back.  At

10   the header.

11       Q.  They're numbered on the lower right corner.

12       A.  Yeah, on page 77, under his name on the

13   personal, what we call personal block, it's got

14   disability specialist, group benefits, national

15   accounts.  And I think you said page 52 before.

16       Q.  Yes.

17       A.  Actually, if you go to page 48, again at the

18   top, it's gonna have Thomas G. McFadden, his

19   professional designation, disability specialist,

20   national accounts.

21       Q.  Do you know what the duties in 2002 of a

22   disability specialist were at CNA?

23              MS. PARSONS:  Objection.  Again,

24          this is beyond the scope.  Any

```
 1              testimony she gives is non-binding on

 2              the company.

 3                   THE WITNESS:  The disability

 4              specialist would be responsible for

 5              various accounts that were assigned to

 6              them.  And they would process, when a

 7              disability claim came in, they would

 8              adjudicate it, you know, gather the

 9              medical information, review the

10              information, partner with a nurse case

11              manager.

12                   They would conduct interviews with

13              the employer, the employee, and then

14              render the claim decision following

15              their investigation.

16      Q.  (By Mr. Feigenbaum)  When did CNA transfer

17      the, I'll call it, the Commonwealth of Massachusetts

18      long term disability claims to The Hartford?

19                   MS. PARSONS:  Objection.  Beyond

20              the scope of the 30(b)(6) notice.

21                   THE WITNESS:  Well, the CNA policy

22              was effective July 1, 2002, so prior to

23              that, I believe Commonwealth of

24              Massachusetts was insured by The
```

```
 1              Hartford.

 2         Q.  (By Mr. Feigenbaum)  My question wasn't good.

 3    Okay.  So from July 1, 2002 and during the entire

 4    time that Miss Christie's -- withdraw the question.

 5    You ever take any courses on fair claims handling?

 6         A.  California fair claims handling.

 7         Q.  When did you take that?

 8         A.  Usually we're required every year.  And the

 9    last time I took the course was June 2005.

10         Q.  How did you take that course?

11         A.  It was online.

12         Q.  And how much total time did that course take?

13         A.  I believe it's up to an hour.

14         Q.  When you say -- so you completed the course

15    in one hour?

16         A.  Yes.

17         Q.  If I heard you correctly, that's something

18    you do pretty much yearly?

19         A.  Yes.

20         Q.  You also said there was some designations

21    next to Mr. McFadden's name?

22         A.  Yes.

23         Q.  What were each of those?

24         A.  Well, there's a professional designation --
```

1      Q.  Go ahead and look.  It's not supposed to be a

2   quiz.

3      A.  I'm looking at page 48.  Actually, the FLMI,

4   FLMI is a professional designation.  It's the LOMA,

5   Life Office Management courses.  And FLMI, which I

6   don't know what the acronym stands for, but I know

7   that's a professional designation.  There's twelve

8   professional courses associated with that.  And ALHC,

9   again, I think that's like -- I mean, I really don't

10  know what the acronym stands for, but again, it's

11  another professional designation for life health

12  courses for the insurance industry.

13     Q.  Do you have any professional designations

14  from the insurance industry?

15     A.  No.

16     Q.  Is there a particular reason why you've

17  elected not to try to obtain those?

18     A.  No, I initiated courses under CNA.  I

19  performed LOMA 1 through 5.  And then just due to

20  time constraints and other interests, didn't pursue

21  it.

22     Q.  What does LOMA stand for?

23     A.  It's Life Office Management I believe Skills

24  or Services, but it's a course through the

1     professional insurance designations.

2          Q.  What were each of the courses that you took

3     under LOMA?

4          A.  They start from the basic introductory to the

5     life claims, health claims, insurance claims.  It

6     works on up.  There's like management of claims.

7     There's also a legal portion of claims.  It's various

8     entities of claims.  And each one at the next step I

9     think would go into accounting and financial

10    actuarial information regarding claims.

11         Q.  And those are all courses that you've taken

12    that you just described?

13         A.  All but the economic and the financial aspect

14    of it.

15         Q.  Each of the courses you took, were they

16    seminars?  Are they online?  Home study?  How does it

17    work?

18         A.  It's home study.  The organization that

19    administers these sends you books, and I mean, you

20    can join an online like study group.  But basically

21    it's just self study, and you're given a certain

22    period of time, and there's actual tests that you

23    would have to take.  It's usually administered by the

24    training department or human resources.

1      Q.   Did you take examinations?

2      A.   Yes.

3      Q.   In what areas?

4      A.   Well, the one through five courses.

5      Q.   Did you take those while you were at -- when

6  was the last time you took an examination of the one

7  through five courses?

8      A.   It was several years ago, so probably about

9  five years ago through CNA.

10     Q.   How many years have you worked with Patricia

11  LaBerge?

12     A.   I don't know when Patricia started with CNA.

13  I know of her.  I mean, I haven't worked directly

14  with her, but I've known of her the past few years.

15     Q.   Do you know anything about her educational

16  background?

17     A.   No.

18     Q.   What year did you first become aware that she

19  was a co-employee of yours at CNA?

20     A.   I don't recall the year.

21     Q.   Do you know if she holds any licenses?

22     A.   I know she's a registered nurse.

23     Q.   Do you know, does that require a license in

24  Florida?

1        A.   I don't know.

2        Q.   Do you know anything about Mr. -- do you know

3   anything else about her work?  Do you know anything

4   about her work background other than working at CNA?

5             MS. PARSONS:   Objection.   These

6             are all beyond the scope of the

7             30(b)(6) notice.

8             THE WITNESS:   No.

9        Q.   (By Mr. Feigenbaum)  Do you know anything

10  about Mr. McFadden's educational background?

11       A.   No.

12       Q.   Do you know anything about Mr. McFadden's

13  work history other than knowing he was a co-employee

14  at CNA?

15       A.   I just recall when he -- I don't know the

16  year he came to CNA, but I just remember he had come

17  from Unum, at that time was Unum.

18       Q.   Do you know he came from Unum because he told

19  you that?

20       A.   Right.

21       Q.   Do you know which Unum office?

22       A.   I believe he was in Atlanta.

23       Q.   Do you know anything about what he did for

24  work at Unum?

```
1       A.  Yes.

2       Q.  What did he do?

3       A.  He had handled disability appeals.

4       Q.  Do you know anything else about

5  Mr. McFadden's work history?

6       A.  No.

7       Q.  How long have you known, is it, Nancy

8  Deskins?

9       A.  Yes.

10      Q.  How long have you known her?

11      A.  Since 1999.

12      Q.  Do you know anything about her educational

13 background?

14           MS. PARSONS:  Objection again to

15           this line of questioning.  Goes beyond

16           the scope of the 30(b)(6) notice.

17           THE WITNESS:  No.

18      Q.  (By Mr. Feigenbaum)  Do you know anything

19 about her work history other than working at CNA?

20      A.  Yes.

21      Q.  What do you know about it?

22      A.  She had been with General Electric Company

23 which I think may have changed names over the years,

24 but she was employed with them for thirty years as a
```

```
1    manager.

2         Q.  Do you know what she did at GE?

3         A.  No.

4         Q.  Has Miss LaBerge ever reported to you?

5         A.  No.

6         Q.  Has Mr. McFadden ever reported to you?

7         A.  No.

8         Q.  Has Miss Deskins ever reported to you?

9         A.  Yes.

10        Q.  During what period of time?

11        A.  Beginning in April of 2002 to current.

12        Q.  What is her current position?

13        A.  She's an appeals specialist.

14        Q.  Your current position is appeals team leader?

15        A.  Yes.

16        Q.  Are there any other appeals team leaders that

17   you're aware of at The Hartford or CNA?

18                  MS. PARSONS:  Objection.

19                  THE WITNESS:  At The Hartford,

20        yes.

21        Q.  (By Mr. Feigenbaum)  What about CNA?

22        A.  No.

23        Q.  Do you still -- do you still identify

24   yourself as a CNA employee rather than a Hartford
```

1    employee?

2        A.   No.

3        Q.   Why do you draw a distinction between CNA and

4    The Hartford when I asked you a question about other

5    appeal team leaders?

6        A.   Well, under my employment with CNA, the

7    Maitland office was the only appeal team CNA group

8    benefits.  I believe we were the only division

9    handling disability claims.  The Hartford has other

10   claims offices and other appeal teams.

11       Q.   In 2000 -- during the time that Miss

12   Christie's claim -- since we don't want to have any

13   guessing going on, Miss Christie's claim was

14   submitted to The Hartford we'll say the fall or

15   September of 2002.  Are you aware of that or do you

16   want to look at documents?

17       A.   Well, if you don't mind, I'd like to take a

18   look at the claim file.

19       Q.   Let me hand you a document that's been marked

20   as Exhibit 4 and ask you if you have ever seen that

21   before.

22       A.   Other than the cover letter, yes, this is the

23   claim file, and I recall seeing this before.

24       Q.   Take a moment and make sure that that's the

1   complete document that you've been referring to as

2   the claim file.  Take as much time as you need.

3        A.  There was just one additional piece of

4   information that I had in the claim file that I

5   reviewed, and that would have been the letter that

6   came in after appeal.

7        Q.  All right.  Is that what I've marked

8   separately as Exhibit 5?  Oh, I'm sorry, Exhibit 2,

9   I'm sorry.

10       A.  Yes, this was the --

11       Q.  When you say this, you have in your hand just

12   so it shows up --

13       A.  Exhibit 2.

14       Q.  Thank you.  That was part of what you were

15   referring to as the claim file?

16       A.  Yes, that was included in the claim file.

17       Q.  If you look at the claim file, when did CNA

18   first become aware of Miss Christie's claim?

19       A.  November 14, 2002.  That's the date of

20   notice.

21       Q.  And in looking at the claim file, when did

22   CNA close that claim?

23       A.  The adverse claim decision was February 3,

24   2003.  And then the appeal was upheld on April 25,

1    2003.  So April 25, 2003 is through the appeals

2    process.

3        Q.  During the time period November 14, 2003

4    through April 25, 2003, did CNA have any medical

5    doctors on staff?

6        A.  There was no medical doctors on staff, no.

7        Q.  Let me say as employees.

8        A.  No.

9        Q.  As of between November 14, 2003 and April 25,

10   2003, did CNA have any vocational manager employees?

11              MS. PARSONS:  Objection.  Both of

12          those questions are beyond the scope of

13          the 30(b)(6).

14              THE WITNESS:  Could you repeat the

15          dates again?

16       Q.  (By Mr. Feigenbaum)  All I'm asking is

17   between the time when the -- I'm just asking between

18   the time period -- did I say November 14, 2002?  I

19   said 3.  That's a mistake.  Can we come up with a

20   shorter version of that?  Can we say while the claim

21   file was open?  Is that fair?  Or do you want me to

22   use dates?

23       A.  I mean, I'm fine with, you know, the date the

24   claim began and the date it ended.

1        Q.   Between the time the date -- between the date

2   the claim began and the claim ended, did CNA have any

3   employees who were employed in the capacity as

4   vocational case manager?

5               MS. PARSONS:   Just restating my

6          objection.

7               THE WITNESS:   Yes.

8        Q.   (By Mr. Feigenbaum)   How many?

9        A.   I don't know how many.

10       Q.   Can you estimate?

11       A.   There was a team leader and could be five to

12   seven vocational case managers.

13       Q.   Can you identify those employees by name?

14               MS. PARSONS:   Again, objection.

15               THE WITNESS:   Well, again, it may

16          -- some of it may not go back to that

17          exact time, but I can -- I do know

18          Eileen Glass was the vocational case

19          manager team leader at that point.   And

20          I can recall a few of the names of the

21          other vocational case managers.

22       Q.   (By Mr. Feigenbaum)   What are those names?

23       A.   Let's see.   There's Raenell, R-A-E-N-E-L-L,

24   May.

1          Q.   Is that M-A-E?

2          A.   M-A-Y.

3          Q.   M-A-Y, sorry.

4          A.   There's Robert Saniglierio.   And I can't

5     venture how to spell his name.   Saniglierio.

6          Q.   I'll say I've seen that name in the claim

7     file.

8          A.   I'm sorry?

9          Q.   I think I've seen that name in the claim

10    file.

11         A.   I don't recall that.

12         Q.   Okay.   Maybe I'm incorrect.

13         A.   I don't recall any vocational case manager's

14    name in the file or reviewing it.

15         Q.   What's the reason no vocational case managers

16    reviewed Miss Christie's claim?

17         A.   Well, at the point that Miss Christie

18    submitted her claim, it was from the own occupation

19    period of the policy.   And typically when the claims

20    team is evaluating if somebody's disabled from their

21    own occupation, they'll base that on the job

22    description, further clarification with the employer.

23    But typically a vocational case manager would not be

24    used until you go into the any occupation provision

1    of the policy.  And Miss Christie's file had not been

2    at that point.

3        Q.  Now, you said a vocational manager is only

4    used typically during the own occupation time period.

5    Are there instances that you're aware of where a case

6    manager has been used during the any occupation time

7    period?

8            MS. PARSONS:  Objection.  Beyond

9            the scope of the 30(b)(6) notice, and

10           any testimony she gives is non-binding

11           on the company.

12           THE WITNESS:  Typically, just to

13           make sure I've corrected -- that I said

14           this correctly, typically during the

15           own occupation provision, the claims

16           examiners would not consult with a

17           vocational case manager.

18               There might be instances if the

19           job was something that was very complex

20           or very unusual or the claims team felt

21           like they needed further clarification,

22           they could go to a vocational case

23           manager for clarification.

24               But typically, the vocational case

1          managers were utilized for the any

2          occupation decisions and using

3          vocational analysis and things of that

4          nature.

5      Q.  (By Mr. Feigenbaum)  Explain to me the

6  process that was utilized in evaluating Miss

7  Christie's claim from the moment it came into the CNA

8  until, we'll say, the final denial was issued on

9  April 25, 2003.

10     A.  Okay.  Typically, the employer would submit

11  what we call a complete claim which would be the

12  employee's statement, the employer's statement, and

13  the attending physician's statement.  In Miss

14  Christie's case, it looks like Miss Christie was the

15  one who may have submitted this information because

16  there was on page 94 it says "to whom it may concern"

17  and then she's indicating that, you know, that she's

18  not been able to work since August 30, 2002.  And

19  then she's referencing the first sheet as incorrect

20  which is actually the long term disability employer's

21  statement on page 95.

22          So it sounds like Miss Christie was the one

23  who submitted all the information regarding her claim

24  which included a job description, an attending

1    physician's statement, a letter from Dr. Johnson, and

2    then her -- her indication that the employer did not

3    indicate accurately that this was a worker's comp

4    claim.

5         So when this information's received, this is

6    what we call a complete claim.  At that point, on

7    page 92, and actually, I think it's another page.

8    Actually, it's page 90 is the sheet is entitled LTD,

9    long term disability national standalone assignment

10   sheet.

11        And this is when the completed claim forms

12   that I've just mentioned are assigned by an intake

13   medical specialist, in this case it was Betty

14   Cameron, who determines, you know, what the diagnosis

15   is.  They assign an ICD code and then they're gonna

16   assign it to a disability specialist.  In this case,

17   she has Tom written.

18        And Miss Cameron at that point had indicated

19   based on Miss Christie's claim submission which is

20   the long term disability statement, and that's on

21   page 99, that Dr. Doug Johnson was a treating

22   physician.  So Miss Cameron requested medical records

23   via fax from Dr. Johnson.

24        And those records did come in.  And let's

1      see.   That begins on page 81 through page 89.

2      There's a fax sheet on page 81 from Dr. Johnson's

3      office notifying that attached are, you know, the

4      medical records totalling nine pages for Miss

5      Christie.

6           And Mr. McFadden on page 80 then conducted a

7      telephone interview with Miss Christie which is part

8      of the claims process.  Also there are some

9      handwritten sheets that will -- that actually run

10     from page 47 up through page 14 or 44 that also

11     explains the claims analysis record, the analogy of

12     the claim, and what happened at each step.

13          But when Mr. McFadden at page 80 conducted

14     his claimant interview, he then followed up with a

15     letter acknowledging -- this is what we call an

16     acknowledgment letter to Miss Christie.  And that's

17     dated November or December 11, 2002, pages 77 through

18     79, explaining, you know, the process and he does let

19     her know that we need further medical records.

20          And then on page 76 dated December 12, 2002,

21     Mr. McFadden conducted an employer interview with

22     Miss Christie's employer to gather further

23     clarification of when she had ceased working and the

24     job duties required.

1          And then on page 64 through 75, Miss Christie

2     had written to Tom McFadden a letter dated January 4,

3     2003 that she's still waiting for office notes from

4     Dr. Brick, explaining the difficulty that she's had

5     obtaining that.  And then she includes a signed

6     integration acknowledgment form which again is part

7     of the claims process to let the claimant know the

8     policy offsets.

9          And then she had included what looks like

10    some more copies of her employer's statement and then

11    an employee's statement which at that point another

12    doctor, Dr. Gregory Brick, had been added on which

13    was different than the original claim form that was

14    submitted in.  And then some further records were

15    attached to that from treatment that Miss Christie

16    had received from a Dr. Von Ertfelda along with a

17    letter from her employer and a letter from

18    Dr. Johnson.

19         And then it looks like following that, on

20    page 57 through page 63, Betty Cameron who at that

21    point had been the original IMS assigned to the file,

22    she receives a fax from Lighthouse Medical Management

23    Incorporated letting them know that -- letting Miss

24    Cameron know that here's claims and notes for the

1    above patient who is Miss Christie and that the

2    doctor's still waiting for payment.

3           And at that point, going back to the

4    handwritten notes to correspond with that, on page

5    46, Mr. McFadden notes on January 24, 2003 that he

6    had received this fax from the Lighthouse Medical.

7    He did give this medical information to the nurse

8    case manager to review.

9           But then he advised Betty with the looks like

10   TPC, which I don't know if he's meaning third party.

11   They may be a third party person submitting these

12   medical records, but he's letting them know that

13   we're not the long term -- the worker's comp carrier,

14   so they would have to contact the worker's comp

15   carrier for responsibility of the medical payment.

16          And then following receipt of that

17   information, on page 56, Mr. McFadden requested a

18   nurse case manager consultation and attached all the

19   medical records that had been received to that point.

20   And on page 55 through 54, Patricia LaBerge had

21   reviewed the information, and she has a one and a

22   half page typed analysis of what records she reviewed

23   and her impression resulting from that.

24          And then on page 53, Tom McFadden had

1    received an e-mail from Don Thompson saying that the

2    above claimant called to advise she was released to

3    work on February 3, 2003 at 6.5 hours a day with

4    restrictions and that she will be forwarding this

5    information to him as well as notes from her previous

6    office visit.

7         Q.   What page is that?

8         A.   Page 53.

9         Q.   Is there anything written in that file other

10   than Mr. McFadden's note saying that Miss Christie

11   had been released to work?

12        A.   Actually, I believe Miss Christie on page 64

13   which is Miss Christie's handwritten note of January

14   4, 2003, Miss Christie's indicating that, see, at the

15   bottom of her letter, she says, "My employer also has

16   agreed that I can return to work on light duty."  And

17   that looks like the e-mail that was sent on January

18   29th was Miss Christie calling to verify she was

19   released to return to work.

20        Q.   Will you agree with me it doesn't say she's

21   been released to return to work.  It makes reference

22   -- Miss Christie's letter talks about light duty.  Is

23   that correct?

24             MS. PARSONS:   Objection.

1            THE WITNESS:  Well, what she says

2        is, "My employer has also agreed that I

3        can return to work on light duty."

4    Q.  (By Mr. Feigenbaum)  What does light duty

5  mean?

6            MS. PARSONS:  Objection.  Requires

7        her to speculate.

8            THE WITNESS:  Well, light duty

9        typically in the Dictionary of

10       Occupational Titles will be walking up

11       to six hours, lifting up to twenty

12       pounds.  There'll be some standing and

13       walking, but that's typically what

14       light duty is.

15   Q.  (By Mr. Feigenbaum)  Is there anything in the

16  file you've seen so far where a medical doctor said

17  Miss Christie could return to work?

18   A.  Actually, going back to the injury that

19  occurred in April of 2001, looking through Dr. Von

20  Ertfelda, it's V-O-N E-R-T-F-E-L-D-A, during his

21  treatment records, he had indicated -- I'm looking at

22  notes of 2001 where he says, "I've also explained to

23  her that it would be best" -- this is on page 72.

24  "I've also explained to her it would be best for her

1     if she got back to work even on a light duty basis.

2     And she will return in one month and will call me if

3     she feels she can return to type of work situation."

4          Q.  And isn't it correct Miss Christie followed

5     his advice and went back to work?

6          A.  Yes, she did return to work.

7          Q.  So explain how the 2001 note is relevant to

8     the 2003 statement of Mr. McFadden that Miss Christie

9     has been released to be returned to work.

10         A.  Well, that was Miss Christie calling, saying

11    that she's been released to return to work light

12    duty.  And the relevant --

13         Q.  Well, no, it doesn't say that, does it?  Read

14    it to me again.

15              MS. PARSONS:  Objection.  You

16         can't argue with the witness.

17              THE WITNESS:  I'm again reading an

18         e-mail that came in on January 29,

19         2003.

20         Q.  (By Mr. Feigenbaum)  From whom to who?

21         A.  Okay.  This is from Don Thompson who actually

22    is in the customer service department of at that time

23    CNA.  And it's Wednesday, January 29, 2003.  Again,

24    this is page 53.  11:10 -- 10:11 a.m. is the e-mail

1    sent to Tom McFadden.  Subject is Joyce Christie,

2    claim number 2445149111, Commonwealth of Mass.

3         It says, "Hi, Tom, the above claimant called

4    to advise she was released to work on February 3,

5    2003, 6.5 hours a day with restrictions.  She will be

6    forwarding this information to you as well as notes

7    from her previous office visit."  And that's the end

8    of the e-mail, so that's --

9         Q.  Is he a medical doctor?

10        A.  Who?

11        Q.  Either of those two individuals.

12        A.  No.

13        Q.  Okay, go ahead.  Go back to where -- what

14   chronologically what happened in the claims process.

15        A.  Okay.  Well, following that e-mail, and

16   actually, Tom McFadden's letter then follows that,

17   and his letter begins on page 48 through page 51.

18   And it's the adverse claims decision, explaining to

19   Miss Christie why her claim has been denied for

20   benefits.  And there was a generic letter on page 52

21   to the Commonwealth of Massachusetts advising them of

22   the claim decision.

23        Q.  Is there anything in Mr. McFadden's letter

24   about an appeal period?

1        A.   Yes, he on the bottom of page 50 and on to

2    page 51, he says, "If you disagree with our decision,

3    you have the right to appeal.  If you have additional

4    medical information not mentioned above or wish us to

5    reconsider our decision, you should take the

6    following actions."  And then on page 51, he explains

7    the appeals process.

8        Q.   Is there anything about time frames?

9        A.   He says, "Submit your formal request for

10   reconsideration in writing to my attention within 180

11   days of the date of receipt of this letter."  Then

12   who he can address it to.  And he says, "Our decision

13   will be reconsidered at the time of receipt of your

14   information.  If this information does not alter our

15   decision, you will be informed of this and your claim

16   will then be submitted for a formal appeal review.  A

17   ruling will be issued within forty-five days of

18   receipt of your request for reconsideration.

19        "There is an additional forty-five days to

20   reach a decision if necessary.  However, you will be

21   notified within the first forty-five days if this

22   review will require an extension of time to reach a

23   decision.  This decision will be in writing and

24   mailed directly to you or your representative.

1    Appeals received later than 180 days may not be

2    considered."

3        Q.   What's the basis of that 180-day time frame?

4        A.   That was the appeal process.

5        Q.   Where -- is that set forth anywhere in the --

6    in the insurance policy?

7                MS. PARSONS:  Objection.  This is

8                beyond the scope of the 30(b)(6)

9                witness.  Notice, rather.

10               THE WITNESS:  No, it's not within

11               the policy.

12       Q.   (By Mr. Feigenbaum)  Where did Mr. McFadden

13   come up with this idea that -- or not this idea.  Why

14   did Mr. McFadden say that no appeal after 180 days

15   will be considered?

16       A.   Because that was the company policy of

17   appeals process.

18       Q.   The two 45-day time periods that are

19   referenced in his letter, are those contained in the

20   insurance policy?

21       A.   No.

22       Q.   Where do those time periods come from?

23       A.   Again, that was the company appeals process.

24   Some policies and I'm not sure with Commonwealth of

1    Massachusetts, but there would be an administrative

2    manual that would be given to the policyholder on how

3    to submit a claim.  And sometimes the appeal

4    information would be located within that

5    administrative manual.

6        Q.  Is there anything in Mr. McFadden's letter

7    saying that the time frames set forth for an appeal

8    are contained in the administrative manual?

9        A.  No.

10       Q.  How is Miss Christie to know if that

11   information was accurate?

12       A.  Well, that was the company appeal process,

13   and that's how the company operated the appeals.

14       Q.  When you say the company, you mean CNA?

15       A.  Correct.

16       Q.  Is that 180-day time period imported from

17   ERISA?

18               MS. PARSONS:  Objection.

19               THE WITNESS:  Well, you know, it

20           is the same time periods that ERISA

21           has, but that was just the -- the

22           appeal process was you had 180 days to

23           submit your appeal.  The appeals team

24           had forty-five to ninety days to

1        respond.

2        Q.  (By Mr. Feigenbaum)  All right.  Go back to

3    the process after Mr. McFadden sent a claim denial

4    letter.

5        A.   Okay.  He sent a claim denial letter.   And

6    then on pages 38 through 43, there was receipt of an

7    appeal request from Attorney Debra Kohl, K-O-H-L.

8    And actually, on page 45, Mr. McFadden notes that on

9    March 11, 2003, received letter from attorney with

10   medical for appeal, forwarded to nurse case manager

11   for review.

12       And on March 11, 2003, on page 44, Patricia

13   LaBerge had reviewed the additional information that

14   was submitted with Attorney Kohl's letter.  And it

15   was the impression that this did not change the prior

16   claim decision.

17       And then on page 37, Mr. McFadden writes a

18   letter to Attorney Debra Kohl letting her know that

19   the file has now been forwarded on to the appeals

20   area for review.  And on April 25th, pages 34 through

21   35, is Nancy Deskins' appeal decision.  And on page

22   36 is a generic letter from Miss Deskins to the

23   Commonwealth of Massachusetts letting them know the

24   appeal decision had been concluded.  And that was the

1    end of the claim file at that point.

2        Q.  During the time period that Miss Christie's

3    claim was being evaluated, did CNA use claims

4    guidelines or a claims manual?

5            MS. PARSONS:  Objection.  Beyond

6            the scope of your 30(b)(6) notice.

7            THE WITNESS:  No.

8        Q.  (By Mr. Feigenbaum)  How did the initial

9    claims handler, Mr. McFadden, know how to assess Miss

10   Christie's claim if he didn't have any medical or

11   impairment training without some kind of guidelines?

12           MS. PARSONS:  Objection.

13           THE WITNESS:  Well, what he did is

14           he reviewed all the information that

15           was submitted.  He did review the -- he

16           had the nurse case manager review the

17           medical information.

18               Pairing that information and input

19           with the policy definition of

20           disability, Mr. McFadden had the

21           ability to determine that Miss Christie

22           did not meet the definition of

23           disability.

24       Q.  (By Mr. Feigenbaum)  Did he make a medical

1    decision in reaching his conclusion?

2              MS. PARSONS:  Objection.

3              THE WITNESS:  He utilized Patricia

4         LaBerge's medical input, the nurse case

5         manager analysis.

6         Q.  (By Mr. Feigenbaum)  Did he make an

7    impairment decision?

8         A.  No.

9         Q.  You used the term a few moments ago ICD code.

10   What is that?

11        A.  It's a -- I don't know what ICD stands for,

12   but I know it's medical codes that doctors will give

13   to different diagnosis or that are recognized within

14   the medical community.

15        Q.  Are those codes for billing purposes?

16        A.  I think primarily that's what they're

17   associated with.

18        Q.  And I believe you said Betty Cameron

19   designated an ICD code?

20        A.  Yes.

21        Q.  What is Betty Cameron's educational

22   background?

23              MS. PARSONS:  Objection.  Beyond

24         the scope.

```
 1                    THE WITNESS:  She's a registered

 2          nurse.

 3       Q.  (By Mr. Feigenbaum)  Do you know if she is

 4    licensed in the state of Florida?

 5       A.  I don't know.

 6       Q.  Do you know anything about her work history

 7    other than working with her at CNA?

 8       A.  No.

 9       Q.  During the time that Miss Christie's claim

10    was open, did CNA have a best practices guidelines?

11                    MS. PARSONS:  Objection.  Beyond

12          the scope.

13                    THE WITNESS:  No.

14       Q.  (By Mr. Feigenbaum)  During the time Miss

15    Christie's claim was open, did CNA have disability

16    evaluation guidelines?

17                    MS. PARSONS:  Objection.  Beyond

18          the scope.

19                    THE WITNESS:  There was an

20          Official Disability, ODG, Official

21          Disability Guidelines that primarily

22          the nurses would use if they were

23          assigning what we call acute durations.

24                    In other words, if somebody had a
```

1           particular -- and it would go by the

2           physical demands of the job.  It goes

3           from sedentary up to very heavy labor.

4           But based on the diagnosis or the

5           primarily diagnosis, how much time

6           would that person be associated to be

7           out such as if they had a broken leg

8           and they had a physical job.

9               The ODG would assign how much time

10          that person would be expected to

11          recover.  But in Miss Christie's case,

12          there was no acute duration or anything

13          like that assigned.

14      Q.  (By Mr. Feigenbaum)  That was a decision made

15  by who?

16      A.  Miss Cameron was the one who initially

17  screened the file and determined who was gonna review

18  the file, and as far as the claims handling, who was

19  gonna be assigned that.

20      Q.  Is there any written analysis of Miss

21  Christie's claim by Betty Cameron contained within

22  that file?

23      A.  There is a handwritten note that's not dated

24  or signed.  Just a second here.  On page 47 which

1    begins the claims analysis record, there's no --

2    received new claim, date of note, date of hire.  It

3    goes into information.

4          It says that the nurse case manager will

5    collect Dr. Johnson's office.  Oh.  "Nurse case

6    manager called Dr. Johnson's office.  Spoke with

7    Reggie.  Requested nurse case manager to fax

8    request."  All this activity corresponds to what Miss

9    Cameron did, although there's no date or signature,

10   but this corresponds to Miss Cameron's actions.

11        Q.  Whose handwriting is that?

12        A.  I can't say with certainty, but I'm assuming

13   this is Betty Cameron.

14        Q.  Why do you think it's Betty Cameron and not

15   someone else like Mr. McFadden?

16        A.  Well, I know the handwriting is not

17   Mr. McFadden's.  And Mr. McFadden has signed and

18   dated every one of his entries.  It just corresponds

19   with the activities of the date and the timing and

20   everything that was done.  All the actions done.

21        Q.  During the time period Miss Christie's file

22   was open, were CNA employees supposed to sign and

23   date activities in the file?

24                MS. PARSONS:  Objection.  Beyond

1          the scope.

2                    THE WITNESS:  Well, yes, it was

3               encouraged that you obviously sign and

4               date your entries.

5      Q.   (By Mr. Feigenbaum)   What's the reason for

6  that?

7      A.   Well, so we can know who made the entry and

8  when.

9      Q.   Who is the publisher of the ODG guides?

10                   MS. PARSONS:  Objection.  Beyond

11              the scope.

12                   THE WITNESS:  I don't know.

13     Q.   (By Mr. Feigenbaum)   When you were working at

14  CNA during the time period that Miss Christie's claim

15  was open, was that a book or an online resource?

16     A.   I've seen it in the book version.   It's like

17  a medical book.  Almost like a dictionary.  There is

18  an online version as well.

19     Q.   Do you know what was available for CNA

20  employees to use during the time period that Miss

21  Christie's file was open?

22     A.   Probably both versions, but more than likely

23  the claims team really didn't utilize ODG.  It would

24  be up to the nursing staff.

1      Q.  You used the term a little while ago

2    Dictionary of Occupational Titles.  What is that?

3      A.  It's a book published by I believe Department

4    of Labor.  And it lists all various occupations

5    within the national economy.  And it assigns specific

6    codes relating to the physical requirements, the

7    complexity of the task.  It's just a Dictionary of

8    Occupational Titles primarily used by vocational case

9    managers.

10     Q.  And do you know that's been out of date since

11   1991?

12              MS. PARSONS:  Objection.

13              THE WITNESS:  I know it's a

14         longstanding document.  I know it's

15         old.

16     Q.  (By Mr. Feigenbaum)  Do you know what it's

17   been replaced with?

18     A.  No.

19     Q.  Are you familiar with something called O*NET?

20     A.  No.

21     Q.  You never heard that term?

22     A.  No.

23     Q.  O*NET?

24     A.  No.

1       Q.   Actually it's spelled O-N-E asterisk T.

2       A.   No.

3       Q.   Have you ever looked at the Dictionary of

4   Occupational Titles while you've been employed at

5   CNA?

6       A.   No.

7       Q.   Would you agree that CNA should have only

8   used qualified individuals to review Miss Christie's

9   claim?

10              MS. PARSONS:  Objection.

11              THE WITNESS:  CNA did use

12          qualified individuals.

13      Q.   (By Mr. Feigenbaum)  Who were the qualified

14   individuals that reviewed the claim?

15      A.   The disability specialists, the nurse case

16   manager.

17      Q.   Would you agree that CNA had an obligation to

18   look at Miss Christie's claim with an eye toward

19   payment?

20              MS. PARSONS:  Objection.

21              THE WITNESS:  I would say CNA did

22          look at Miss Christie's claim in

23          comparison to the policy and did the

24          medical evidence and the information

```
1              presented support disability.

2         Q.  (By Mr. Feigenbaum)  My question is do you

3    agree that CNA had an obligation to look at Miss

4    Christie's claim with an eye towards payment rather

5    than towards denial?

6              MS. PARSONS:  Objection.

7              THE WITNESS:  Well, again, it

8         wasn't -- it wasn't looked at to deny

9         the claim.  It was looked at did she

10        meet the requirements that are

11        specified under the policy, and if so,

12        she would have been approved for

13        payment.

14        Q.  (By Mr. Feigenbaum)  Would you agree that CNA

15   had an obligation to fully understand Miss Christie's

16   medical situation before denying her claim?

17             MS. PARSONS:  Objection.

18             THE WITNESS:  Well, based on the

19        claimant interview that was done in

20        addition to clarification with the

21        employer and obtaining the medical

22        records including going back to Miss

23        Christie's injury of 2001 to find out

24        what had happened in 2002, I feel it
```

1          was thoroughly investigated and

2          evaluated.

3      Q.  (By Mr. Feigenbaum)  Is there written

4  documentation that there was a conversation with Miss

5  Christie's employer?

6      A.  Yes.

7      Q.  Where is that?

8      A.  Actually, on page 46, the top entry is

9  December 12, 2002.  And Tom McFadden writes that he

10  placed a call to the employer.  And then in

11  parentheses, it was Barbara Pacheco.  And he asked

12  about -- let's see.  He said, "I asked Barbara about

13  worker's comp status and last date worked.  Barbara

14  indicated that Miss Christie was paid up until 9/20.

15  Her actual last date physically at work was 8/30.  I

16  told her I had some additional questions, and she

17  transferred me to Cindy Cassidy, director."

18          And then he has in parentheses "see phone

19  conversation" which there's a separate entry for

20  that.  And he says he will assist claimant or it

21  says, "Will claimant reply to acknowledgment letter

22  and records from Dr. Brick will follow up the week

23  of."  He says -- I think he says, "Will send

24  acknowledgment reply letter to the claimant asking

1    for Dr. Brick's records.  He'll follow up the week of

2    12/16."

3           And then if you actually go to the

4    handwritten conversation with the employer which is

5    on page 76 dated December 12, 2002 by Tom McFadden.

6    Has an employer interview.  It says, "Miss Cassidy

7    confirmed that employee was injured in a motor

8    vehicle accident while working April 2001.  She said

9    she was out of work for six months and received

10   worker's comp until she returned to work

11   approximately October 2001.

12          "When employee returned to work, her only

13   restriction was no lifting which her occupation did

14   not require.  She did not have any other

15   restrictions.  She worked her regular occupation and

16   received full salary.  Her attendance was good.  And

17   the only thing Miss Cassidy observed was that Miss

18   Christie walked a little bent over since the

19   accident.

20          "Miss Cassidy said that Miss Christie was

21   working up until August when she had a note that

22   restricted her from stand, slash, sit, stand, walk.

23   She said that based on this, she released her.  She

24   released her if she would not be able to work."

1          With regards to the occupation, Tom has Miss

2     Christie, but I think he meant Miss Cassidy "said

3     that once a month they have to walk to deliver rent

4     notices and periodically walk to do apartment

5     restrictions.  More" -- I think it's "more this than

6     not, they are in the office.  They do not have to

7     lift."  And that was Mr. McFadden's conversation with

8     the employer clarifying the work duties.

9          Q.  Would you agree that CNA had an obligation to

10    understand Miss Christie's occupational duties before

11    denying the claim?

12               MS. PARSONS:  Objection.

13               THE WITNESS:  Well, based on the

14               job description that was submitted

15               along with Mr. McFadden's clarification

16               to the employer, CNA did have an

17               understanding of Miss Christie's job

18               description.

19         Q.  (By Mr. Feigenbaum)  Is it correct that

20    there's a written job description in the file?

21         A.  Yes.

22         Q.  What was Miss Christie's occupation?

23         A.  Her official title is...

24         Q.  If I could save time, I think it's in the

1    back.

2         A.   On page 95, it's assistant to housing

3    manager, in parentheses, floater.

4         Q.   Isn't there a three page occupational

5    description in the claim file?

6         A.   Yes.

7         Q.   Is there any reason that anyone at CNA

8    doubted that the written job description accurately

9    reflected Miss Christie's occupation?

10             MS. PARSONS:   Objection.

11             THE WITNESS:   No, I think with

12        Mr. McFadden's phone call to the

13        employer, he wanted to make sure that

14        he had a clear picture of what the job

15        description was and the duties

16        required.

17        Q.   (By Mr. Feigenbaum)  Are there any notes in

18   the file saying that the written job description is

19   inaccurate based on a conversation with the employer?

20        A.   No.

21        Q.   Is it correct that CNA had an obligation to

22   fully understand Miss Christie's medical condition

23   whether it was mental or, strike that, whether it was

24   psychiatric based or physical before denying the

1    claim?

2                    MS. PARSONS:  Objection.

3                    THE WITNESS:  Well, again, based

4            on the medical records submitted, the

5            interview that Mr. McFadden had done,

6            and he did question Miss Christie about

7            any psychiatric treatment, and based on

8            all the evidence presented, I think the

9            company did evaluate all that

10           information.

11   Q.  (By Mr. Feigenbaum)  Looking in the claim

12   file, how can you tell that any psychiatric analysis

13   was conducted?

14   A.  Well, there was not a psychiatric analysis

15   conducted.

16   Q.  Isn't it correct that in Miss Christie's

17   medical doctor's notes there's references to her

18   suffering from depressive episodes?

19                   MS. PARSONS:  Objection.

20                   THE WITNESS:  Well, the records do

21           mention she's on antidepressant

22           medication.

23   Q.  (By Mr. Feigenbaum)  Is there anything in the

24   claim file indicating that CNA actually ordered

1    records from any medical doctor that treated Miss

2    Christie?

3         A.   Yes.

4         Q.   What records did CNA order?

5         A.   There was a fax request from Betty Cameron to

6    Dr. Johnson for his medical records.

7         Q.   Why were medical records not requested from

8    any other doctor that treated Miss Christie?

9         A.   Well, originally when the claim was filed,

10   Miss Christie only indicated that she was under the

11   treatment on page 99 of Dr. Johnson.  And then in her

12   interview with Mr. McFadden of December, December 11,

13   2002, which is page 80, Mr. McFadden, he goes on to

14   say, "I told Miss Christie that I've received

15   Dr. Johnson's records since September 2002 and that

16   there was not a lot there with regard to what was

17   causing her back pain.  She acknowledged that he only

18   evaluated her and that she has not undergone any

19   testing in 2002.

20        "Miss Christie did tell me that she did go to

21   see Dr. Gregory Brick and provided his phone number

22   in Boston, his fax number, and that her initial

23   evaluation was on November 22nd and she will return

24   on December 12th.  She did say that she will be

1    having additional testing, a bone scan, and possibly

2    another MRI.  She did confirm that a previous testing

3    was done in 2001 and was negative."

4         And then in the acknowledgment letter that

5    Mr. McFadden sent to Miss Christie on page 77,

6    December 11, 2002, he indicates in the middle of

7    that, it says, "At this time, additional information

8    is necessary concerning the details of your medical

9    condition.  We need you to provide us with copies of

10   your medical records for treatment in 2001.  We also

11   need to obtain a copy of the office note from your

12   recent exam with Dr. Gregory Brick and all test

13   results."

14        Q.  At the time Mr. -- what page is that letter

15   you're reading?

16        A.  77.

17        Q.  At the time Mr. McFadden wrote the letter as

18   contained on page 75, didn't CNA have in its

19   possession a blanket authorization from Miss Christie

20   to obtain medical records?

21        A.  Well, yes, there was an authorization.

22        Q.  What's the reason that CNA placed the burden

23   on Miss Christie to get the records rather than

24   obtaining -- rather than having CNA write for the

1    records?

2        A.   In the policy, the proof of loss provision

3    requires that the claimant, and I can read it to you

4    if you like, but it is the claimant's responsibility.

5    Just one second.   Okay.   Under beginning on page 26

6    on to page 27, the filing of claim, and on page 27

7    has proof of disability.   And it says, "The following

8    items supplied at your expense must be part of your

9    proof of loss.   Failure to do so may delay, suspend,

10   or terminate your benefits."

11       And part of this it says, "You have to supply

12   proof of when your disability began, the cause of

13   your disability, the prognosis of your disability,

14   proof that you're receiving appropriate care."   Goes

15   on to, "Objective medical findings which support your

16   disability and objective medical findings include,

17   but are not limited to test procedures or clinical

18   examinations standardly accepted in the practice of

19   medicine for your disabling conditions."

20       And then it goes on down, "To the extent of

21   your disability, appropriate documentation of your

22   monthly earnings, if you're contributing to the

23   premium, the name and date of any hospital, health

24   care facility where you've been treated for

1    disability."  And then the last part of that is, "If

2    applicable, proof of incurred costs covered under the

3    other benefits incurred in the policy."  So it was a

4    proof of loss that it was Miss Christie's requirement

5    to provide this information.

6        Q.  My question is, though, so is it the policy

7    of CNA that the insured is required to retrieve all

8    the medical records on behalf of CNA?

9              MS. PARSONS:  Objection.

10             THE WITNESS:  Well, CNA will

11             obtain the medical records and they did

12             in this case of what Miss Christie had

13             indicated on her initial claim form.

14       Q.  (By Mr. Feigenbaum)  All right.  And then

15   after receiving the records from Dr. Johnson, if you

16   look at his September 20th report, you'll see CC's to

17   various doctors.

18       A.  Which page are you talking?

19       Q.  If you look at his medical notes, there's a

20   medical note of his examination of Miss Christie on

21   September 20, 2002.

22             MS. PARSONS:  Do you have a page

23             number?

24       Q.  (By Mr. Feigenbaum)  It may be at 59.  Turn

1    to page 60 or 61.  Do you see CC's to various medical

2    doctors?

3        A.  Yes, I do.

4        Q.  Why didn't CNA obtain those records using the

5    blanket release Miss Christie provided?

6        A.  Because in Mr. McFadden's interview with Miss

7    Christie, he asked about the medical sources and who

8    she was seeing.  And according to Miss Christie, it

9    was just Dr. Johnson who she had just seen that one

10   time and there was no other treatment at the

11   beginning of 2002.

12       Q.  Can you explain to me why CNA was interested

13   in some treatment after the 2001 medical accident

14   from a particular doctor, but not all the doctors

15   listed in Exhibit 4 on page 61?

16               MS. PARSONS:  Objection.

17               THE WITNESS:  Well, what CNA and

18           the claims team was trying to

19           understand is Miss Christie had a motor

20           vehicle accident in September -- April

21           of 2001.  She was out of work for a

22           period of time, but then returned to

23           work by the employer's own admission at

24           full duties full-time.  And then she

```
 1              was unable to work beginning August 30,

 2              2002 based on a note that apparently

 3              was presented to the employer.

 4                   And the claims team was just

 5              trying to understand what transpired

 6              over this period of time leading to

 7              Miss Christie's inability to work.  And

 8              they looked for the medical information

 9              paired with the job description and the

10              employer's information along with the

11              policy to see if disability is met.

12      Q.  (By Mr. Feigenbaum)  Let me ask the question

13  again.  If your answer is I don't know, just say so.

14  Why did CNA not seek medical records from the four

15  other doctors identified on Exhibit 4, page 61?

16                   MS. PARSONS:  Objection.  She

17              answered the question.

18                   THE WITNESS:  Yeah, again, I mean,

19              it's just what I stated.  Dr. Johnson's

20              records were obtained.  Lighthouse

21              Medical Billing did send information.

22              The other -- and mentions here Jean

23              Crabtree, Kenneth Piva.

24      Q.  (By Mr. Feigenbaum)  P-A -- P-A-I-V-A?
```

1        A.  I'm sorry, where's that?

2        Q.  Piva you said.

3        A.  Piva, right, P-I-V-A.  And then the worker's

4    compensation carrier, those records were not

5    obtained.

6        Q.  Why weren't the records obtained from the

7    worker's compensation carrier?

8        A.  Well, at that point, I think the employer had

9    mentioned that there was no worker's comp claim and

10   there was no indication on the claim form, although

11   Miss Christie had indicated that the employer

12   completed that incorrectly.  So as far as we knew,

13   there was no worker's comp claim on this.

14       Q.  Didn't I just hear you say, though, Miss

15   Christie advised CNA, specifically Mr. McFadden that

16   the worker's comp information had been incorrectly

17   provided?

18       A.  Well, on her letter that she attached to the

19   claim submission, she indicates the first sheet is

20   incorrect.  This is page 94.  "The first sheet is

21   incorrect.  The injury is due to injury while

22   employed, and my attorney has filed for my worker's

23   compensation benefits to start up again.  So as of

24   this date, November 12, 2002, no income at all.  I

1    have not worked since August 30, 2002 and sent home."

2         And the form that she's referring to which is

3    page 95, LTD employer's statement the employer

4    completed, has this employee filed for worker's

5    compensation, and they have no.  And that's dated

6    October 10, 2002.

7    Q.  Is there anything in the file that caused CNA

8    to believe that Miss Christie was not being candid

9    when she said she had filed for worker's compensation

10   benefits?

11   A.  No.  As a matter of fact, in Mr. McFadden's

12   conversation with the employer, they had mentioned I

13   think back earlier in 2001 she had received worker's

14   comp, but had received full salary, so paid the

15   worker's comp back.

16   Q.  Explain to me how she received a full salary

17   and paid the worker's comp back.

18   A.  Again, I have to go back to what was reported

19   to Mr. McFadden in his conversation.  I think it was

20   on the CAR.  Hold on a second.  It was on the CAR

21   note.  In his conversation with Barbara Pacheco.  Let

22   me take that back.  If you can give me a few minutes

23   'cause I know I read this note.  I might be mixing up

24   my sources, but I do know there was a mention that

1     she had been approved for worker's comp, but paid it

2     back because she was receiving full salary.

3          Q.  All right.  I'll take your word that you read

4     that somewhere in the file.

5          A.  I know I can locate it.  I just need a few

6     more minutes.

7          Q.  Okay, take your time.

8          A.  Okay.  On page 80, and this is Mr. McFadden's

9     telephone conversation with Miss Christie dated

10    December 11, 2002, and it's towards the below the

11    middle of the page.  It says, "Miss Christie is

12    divorced and she lives by herself.  She told me that

13    she lives in a single family home that is one story.

14    She has no income at this time.

15          "She did get worker's comp while she was out

16    for six months in 2001 and paid it back to her

17    employer since she continued to receive her salary.

18    Her worker's compensation benefits have not been

19    reinstated since she stopped working again.  She does

20    have an attorney that is representing her for this.

21    She has applied for social security since she worked

22    other jobs and contributed prior to 1978, but she

23    does not believe that she'll be eligible."  So I

24    mean, it's just a statement Miss Christie made back

1    on worker's compensation benefits in 2001.

2        Q.  Well, isn't it correct that's Mr. McFadden's

3    statement that you're reading from, not Miss

4    Christie's?

5              MS. PARSONS:  Objection.

6              THE WITNESS:  It's based on his --

7              what Miss Christie told him during the

8              interview.

9        Q. (By Mr. Feigenbaum)  At the time -- during

10   the time period that Miss Christie's claim was open,

11   did CNA have a duty of good faith and fair dealing

12   implied in the insurance contract in evaluating Miss

13   Christie's claim?

14             MS. PARSONS:  Objection.

15             THE WITNESS:  Yes.

16       Q. (By Mr. Feigenbaum)  Does it appear from

17   reading the claim file that Miss Christie was

18   cooperative with CNA at all times?

19       A.  Yes.

20       Q.  For example, she gave a blanket release to

21   CNA.  Is that correct?

22       A.  Yes.

23       Q.  She never revoked it?

24       A.  Correct.

1        Q.   She signed the integration agreement?

2        A.   Yes.

3        Q.   Is an integration agreement in generic term

4   something that's often referred to as a reimbursement

5   agreement or relating to offsets?  Is that correct?

6              MS. PARSONS:  Objection.

7              THE WITNESS:  Yes.

8        Q.   (By Mr. Feigenbaum)  Anything in the file to

9   indicate Miss Christie was belligerent in her

10  dealings with CNA?

11       A.   No.

12       Q.   Is there anything in the claim file that

13  indicates that Miss Christie was trying to submit a

14  fraudulent claim?

15       A.   No.

16       Q.   During the time period that Miss Christie's

17  claim file was open, what was the procedure at CNA

18  for ordering medical records?

19              MS. PARSONS:  Objection.  Beyond

20         the scope.

21              THE WITNESS:  Typically, again,

22         when the claim's submitted, you have

23         the attending physician's statement,

24         the employer and employee statement.

```
 1              And the nurse case manager would

 2              typically make the request for medical

 3              records.

 4                   And they would look at the

 5              attending physician's statement and the

 6              sources that are typically indicated on

 7              the employee's statement and make the

 8              request for the medical documents at

 9              that point.

10     Q.  (By Mr. Feigenbaum)  What was the process,

11  though, for doing it?

12     A.  They would fax it to the doctor's office with

13  the authorization attached.

14     Q.  Is that something that Mr. McFadden did?  I'm

15  not saying specifically to Miss Christie's claim, but

16  during the time period that Miss Christie's claim was

17  open?

18              MS. PARSONS:  Objection.

19              THE WITNESS:  No, typically the

20              nurse case managers would obtain the

21              medical records.

22     Q.  (By Mr. Feigenbaum)  When did the nurse case

23  manager first become involved in Miss Christie's

24  claim?
```

1      A.  At the initial claim receipt, Betty Cameron

2   was one of the nurse case managers, like I said, in

3   the IMS role which is a screening role where she

4   would make the request via fax for the medical

5   records.  And then once that -- those records come

6   in, she presents it to Tom McFadden who then

7   requested Patricia LaBerge to make the evaluation of

8   the medical records received.

9      Q.  We've gone an hour and forty-five.  Should we

10  take a break for fifteen minutes or do you want to

11  keep going?

12             MS. PARSONS:  I could use a

13         restroom break.

14             THE WITNESS:  I could use a break.

15             MR. FEIGENBAUM:  Let's take a

16         break for fifteen minutes.

17             (Off the record.)

18      Q.  (By Mr. Feigenbaum)  At the time Miss

19  Christie's claim was open, were all the documents

20  that became part of the claim file scanned?

21      A.  No.

22      Q.  Imaged?  I mean, does that make sense to you

23  when I say scanned or imaged?

24      A.  Yes, but I don't believe we scan or image any

1    of our documents.

2    Q.  During the time period that Miss Christie's

3    claim file was open, was there a particular reason

4    why no outside medical doctors were consulted?

5    A.  Well, Mr. McFadden made the referral to the

6    nurse case manager, Patricia LaBerge.  And typically

7    if the nurse case manager felt like the medical

8    information or the condition was beyond their

9    expertise, they would then go to a medical reviewer,

10    a physician.  But given Miss LaBerge's review of the

11    file and her input, there was no need to go any

12    further to a medical reviewer.

13    Q.  Is that your speculation or do you know that

14    from asking questions of Miss LaBerge?

15    A.  No, I know that for the claim handling,

16    typically files are not sent to a medical reviewer

17    unless a nurse feels the information is beyond their

18    expertise or capability of reviewing.

19    Q.  In preparing for today's deposition, did you

20    ask Miss LaBerge why didn't you send this file to an

21    outside medical doctor?

22    A.  No.

23    Q.  In preparing for today's deposition, did you

24    ask -- I'm sorry.  In terms of using -- during the

1    time period Miss Christie's claim file was open, did

2    CNA use outside vocational sources?

3                    MS. PARSONS:  Objection.

4                    THE WITNESS:  Well, there would be

5            like labor market surveys that could be

6            done outside of the vocational team.

7        Q.  (By Mr. Feigenbaum)  Did the vocational team

8    review Miss Christie's file?

9        A.  No.

10       Q.  And why not?

11       A.  Because it wasn't referred for a vocational

12   case manager review based on the fact that the claim

13   was in the own occupation period.

14       Q.  Did Mr. McFadden during the time period that

15   the claim file -- let me withdraw the question.  Was

16   Mr. McFadden the only -- was Mr. McFadden the person

17   who had authority whether or not to pay Miss

18   Christie's claim while it was open and before it went

19   to the appeals team?

20       A.  Well, once he made his claim decision,

21   whether it was to approve a claim, well, I'm not sure

22   about the approval or what his authority is, but I do

23   know when he made the recommendation to deny the

24   claim, that it was sent to his claim team leader to

1   review.

2          Q.   Who was his claim team leader?

3          A.   Linda Walker.

4          Q.   Is there anything -- during the time period

5   Miss Christie's claim was open, did Miss Walker deny

6   -- review claims that had been denied?

7          A.   Yes.

8          Q.   Is there any reason you can tell from reading

9   the file that Miss Walker did or did not review this

10  claim?

11         A.   Yes.

12         Q.   What is that?

13         A.   On page 46 of the claim analysis records

14  towards the very bottom, on January 27, 2003, Tom

15  McFadden reports "claim referred to" and he has the

16  initials "CTL for review."  And CTL would be the

17  claim team leader.  And on February 3, 2003, it's

18  hard to distinguish, but that's Linda Walker's

19  signature.

20         Q.   Is there a comment that Linda Walker wrote on

21  page 46?

22         A.   No, just her signature.

23         Q.   To prepare for today's deposition, did you

24  speak with Linda Walker?

```
 1        A.   No.

 2        Q.   Is she still employed at CNA?

 3        A.   Yes.

 4        Q.   In what capacity?

 5        A.   She's a claim team leader.

 6        Q.   As the claim team leader, is she on the

 7   organizational chart above Mr. McFadden?

 8        A.   Yes.

 9        Q.   Do you know what her signature on page 46

10   means?

11        A.   Yes, her signature means that she reviewed

12   the file and she's in agreement with that decision.

13        Q.   How do you know that her signature means she

14   reviewed the file if it doesn't say that?

15        A.   Well, because if she had returned the file or

16   wanted further action, that would be documented.  But

17   typically when we see just the team leader's

18   signature, then that means they're in agreement with

19   the decision.

20        Q.   Just 'cause I can't see from here, on page

21   46, other than the signature of Linda Walker, there

22   is nothing else she wrote on page 46.  Is that

23   correct?

24        A.   Correct.
```

1    Q.  Is it your -- is it fair to say or is it your

2    -- strike the question.  Is it your understanding

3    that Miss Christie said she couldn't work because she

4    was in pain?

5            MS. PARSONS:  Objection.

6            THE WITNESS:  My understanding is

7           that she brought a note in to her

8           employer, and the employer indicated

9           that she wasn't able to perform full

10           duty so that she wasn't able to

11           continue working, and I do believe pain

12           was associated with that.

13    Q.  (By Mr. Feigenbaum)  Is that note in the

14    claim file?

15    A.  Not the note that I'm aware of that she

16    produced to the employer.

17    Q.  And the basis of your belief that a note was

18    actually produced to the employer is because, correct

19    me if I'm wrong, there's a letter in the file that

20    the employer said they were sending her home until

21    she was cleared to work?

22            MS. PARSONS:  Objection.

23            THE WITNESS:  Well, yes, that and

24           plus Miss Christie herself had wrote

1            that she brought a note to her employer

2            and her employer indicated that she

3            wasn't able to work and then gave her

4            the letter that turn in their keys and

5            so forth and not to return to work

6            until she was able to do the job.

7      Q.   (By Mr. Feigenbaum)  But would you agree that

8      it's impossible to objectively measure pain?

9            MS. PARSONS:  Objection.

10           THE WITNESS:  Well, I do agree

11           that pain is subjective.

12     Q.   (By Mr. Feigenbaum)  Isn't pain always

13     self-reported?

14           MS. PARSONS:  Objection.

15           THE WITNESS:  Typically, yes.

16     Q.   (By Mr. Feigenbaum)  Can you give me any

17     instance how it is possible to objectively measure

18     pain?

19           MS. PARSONS:  Objection.  This is

20           all beyond the scope of the 30(b)(6)

21           notice.

22           THE WITNESS:  Well, I mean, there

23           are medical tests.  I mean, if somebody

24           has a fracture, something significant,

```
 1              trauma, and typically, you know, the

 2              pain is associated at a high level,

 3              that's easy to correlate with the

 4              physical findings.

 5      Q.  (By Mr. Feigenbaum)  I mean, for example, if

 6  you're tired of listening to my questions and you

 7  come across the table and slap me in the face and I

 8  say that really hurt, how can you objectively measure

 9  that pain?

10              MS. PARSONS:  Objection.

11              THE WITNESS:  Again, I can't.

12              It's subjective and everybody has their

13              own degree of pain and tolerance.

14      Q.  (By Mr. Feigenbaum)  So is it correct that

15  Miss Christie reported pain to her treating doctor,

16  Dr. Johnson, he had an ability to assess whether her

17  pain was credible?

18              MS. PARSONS:  Objection.

19              THE WITNESS:  Well, let me look at

20              Dr. Johnson's records for a minute.

21      Q.  (By Mr. Feigenbaum)  Sure.  I think maybe if

22  you look around page 60.

23      A.  Right.

24      Q.  You're on page 59?
```

1          A.   Yeah, actually, page 59 which is -- it says

2     Dr. Johnson.   Right.   It goes from page 59 to page

3     61.   The evaluation of September 20, 2002.   And in

4     his history of Miss Christie's present illness, he

5     says, "The patient is a 51-year-old female who is

6     referred to me for evaluation for longstanding low

7     back pain."   And then he goes into, you know, the

8     motor vehicle accident, and she states she's had

9     quite a bit of back pain at the time of the injury.

10    And then it goes into x-rays and initial reports.

11         And then he does say, "She states over the

12    next few days her pain actually got worse.   She had

13    more and more difficulty.   She was out of work for

14    about six months.   Eventually had some therapy.   Saw

15    a few other physicians.   Saw Dr. Von Ertfelda as well

16    as Dr. Maizer.   Had trials of therapy that were

17    unsuccessful.

18         "She went back to her work, was working there

19    full-time for another ten months or so, and

20    eventually at the end of August was asked to not go

21    back to work as it was felt she could not do her job.

22    She is now here for further evaluation."

23         Q.   The record goes on for another page and a

24    half.   Correct?

1        A.   Correct.

2        Q.   Okay.  Why didn't CNA order Dr. Maizer's

3    records?

4        A.   I don't know.

5        Q.   What is the reason that CNA concluded that

6    Miss Christie's report of her pain being debilitating

7    was not sufficient to require CNA to pay benefits to

8    her?

9        A.   Well, the pain based on the physical findings

10   which basically you go into the physical findings

11   which are on page 60 of Dr. Johnson's physical

12   examination, it says, "This is a pleasant, alert

13   female in no acute distress.  She has very restricted

14   range of motion.  She bends backwards only five

15   degrees and really cannot even get up to neutral.

16   She walks with the hips flexed.

17        "She has normal strength in the lower

18   extremities, normal sensory examination, and normal

19   reflexes.  Gait and station are antalgic, and she's

20   very teary throughout the evaluation."  And says,

21   "She presents with longstanding low back pain and leg

22   pain with a normal lumbar MRI."

23        And Miss LaBerge in her review of the records

24   basically went through all the physical findings, the

1    diagnostic testing, and that the residuals were mild

2    and felt that the claim was not supported for the

3    inability to perform the substantial and material

4    duties of her occupation.

5        Q.  Why were Miss -- why were Miss Christie's

6    subjective reports of pain discounted by Miss

7    LaBerge?

8        A.  Well, the complaints of pain were not

9    discounted, but they were felt to be disproportionate

10   to the physical findings with essentially mild

11   findings.  There were some abnormalities and

12   degenerative changes, but they were all mild.  And

13   the fact that she had also been working full-time for

14   well after ten months from the motor vehicle

15   accident, there was no change in the condition that

16   would preclude Miss Christie from continuing to work.

17       Q.  Is it CNA's position that Miss LaBerge who

18   never examined Miss Christie could assess her

19   functional limitations better than Dr. Johnson who

20   actually examined her?

21           MS. PARSONS:  Objection.

22           THE WITNESS:  Well, Miss LaBerge

23           based her evaluation on the records

24           that Dr. Johnson had provided which

1               does include the physical and

2               diagnostic testing and the results.

3        Q.   (By Mr. Feigenbaum)   You're aware that

4    Dr. Johnson is ABMS certified as a physiatrist?

5        A.   Yes.

6        Q.   And do you have an understanding of what type

7    of specialist a physiatrist is?

8        A.   Some.

9        Q.   What is your understanding?

10       A.   Well, physiatrists usually will specialize in

11   like sports medicine, occupational injuries, a

12   combination of injuries that really are a little bit

13   more fine tuned.  Sometimes like your myalgias,

14   fibromyalgias on some points.  A little bit different

15   specialty than say an internal medicine or an

16   orthopedic.  A little bit more rounded out.

17       Q.   CNA has hired physiatrists to review claims

18   in the past, has it not?

19               MS. PARSONS:  Objection.  Beyond

20          the scope.

21               THE WITNESS:  Well, we had medical

22          reviews done by peer reviewed

23          physicians that are physiatrists.

24       Q.   (By Mr. Feigenbaum)  And have you ever

1    ordered any peer review physiatrist to review medical

2    claims, I'm sorry, to review claims?

3                    MS. PARSONS:  Objection.

4                    THE WITNESS:  Yes, in the past.

5        Q.  (By Mr. Feigenbaum)  And you're aware in

6    order for Dr. Johnson to become ABMS board certified

7    in physical and rehabilitation medicine, he had to

8    have four years of post medical school training?

9                    MS. PARSONS:  Objection.

10                   THE WITNESS:  Yes.

11       Q.  (By Mr. Feigenbaum)  And you're aware that he

12   had to pass a written examination of about 325

13   questions?

14                   MS. PARSONS:  Objection.

15                   THE WITNESS:  I don't know the

16                   length of the questions, but yes, I do

17                   know that --

18       Q.  (By Mr. Feigenbaum)  And you're aware he had

19   to go through three 40-minute interviews?

20                   MS. PARSONS:  Objection.

21                   THE WITNESS:  Again, I don't know

22                   the details of what's entailed.

23       Q.  (By Mr. Feigenbaum)  Are you aware that he

24   has to re-certify every ten years in order to

```
 1    maintain a designation by that particular medical

 2    board?

 3              MS. PARSONS:  Objection.

 4              THE WITNESS:  I'm not aware of

 5         that.

 6    Q.  (By Mr. Feigenbaum)  And from the records

 7    that -- the record that's in the file starting on

 8    page 59 through 61, you're aware that Dr. Johnson

 9    obviously examined Miss Christie on September 20,

10    2002.  Is that correct?

11    A.  Correct.

12    Q.  And you're aware he had the ability to assess

13    Miss Christie's credibility?

14              MS. PARSONS:  Objection.

15              THE WITNESS:  Well, yes, that he

16         did perform an evaluation and reviewed

17         diagnostic testing and made treatment

18         recommendations.

19    Q.  (By Mr. Feigenbaum)  And within that medical

20    record, isn't it correct that Dr. Johnson offered an

21    opinion as to Miss Christie's level of functional

22    impairment?

23    A.  I'm sorry, could you repeat that?

24    Q.  Did anywhere in the file, did -- I'm sorry.
```

1    If you turn to page 100, is that I'll call an FCE

2    type form completed by Dr. Johnson?

3        A.  Yeah, it's a form that would be comparable to

4    a functional capacity -- capacity evaluation.

5        Q.  What is a functional capacity evaluation?

6        A.  Well, this here is like -- well, let me back

7    up for a minute.  This is what you would call a

8    physical capacity evaluation where the doctor is

9    based on probably the diagnosis and evaluation

10   performed is indicating in the doctor's opinion what

11   physical restrictions the claimant's capable of.

12       A functional capacity evaluation is something

13   different.  That's usually further testing that's

14   done by either an occupational therapist or physical

15   therapist where a person goes through a series of

16   physical demands to determine what rate they're

17   capable of performing.

18       Q.  All right.  If you look at page 100, we'll

19   call it a physical capacities form.  If you look in

20   the middle of the form, do you see where it says

21   recommendations for regular work?

22       A.  Yes.

23       Q.  And do you see that Dr. Johnson has checked

24   the box that says lifted -- lifting limited to one to

1    five pounds?

2         A.  Yes.

3         Q.  And do you see he's checked another box,

4    carrying limited to one to five pounds?

5         A.  Yes.

6         Q.  Do you see he's also checked another box that

7    says pushing, pulling limited to one to five pounds?

8         A.  Yes.

9         Q.  Do you also see that he's checked another box

10   in the lower right that says no reaching below the

11   waist?

12        A.  Yes.

13        Q.  Do you see he's also checked a box that says

14   decrease continuous walking or standing to ten

15   minutes at a time?

16        A.  Yes.

17        Q.  If Dr. Johnson's opinion of Miss Christie was

18   correct on October 21, 2002, was she entitled to be

19   paid benefits under the CNA policy?

20             MS. PARSONS:  Objection.

21             THE WITNESS:  Well, the medical

22        findings would have to support these

23        restrictions and limitations.  And

24        that's where the dispute was is that

1              these restrictions and limitations are

2              disproportionate to the physical and

3              diagnostic findings on the examination.

4         Q.  (By Mr. Feigenbaum)  Well, that's a

5    conclusion.  Tell me what is disproportionate.

6         A.  Well, the fact that, I mean, all of these.

7    Lifting limited below five pounds.  Being able to

8    continuously stand or walk for ten minutes at a time.

9         Q.  Could you explain to me how Nurse LaBerge

10   knew better than Dr. Johnson when she never examined

11   Miss Christie?

12              MS. PARSONS:  Objection.

13              THE WITNESS:  If we go to Miss

14              LaBerge's evaluation and her

15              conclusions of that evaluation, page 55

16              to 54, and she does indicate in her

17              nurse case manager impression on page

18              54.

19              It says, "Available medical

20              information shows no significant change

21              in employee's condition since she began

22              seeing" and she does indicate

23              Dr. Shapiro on June 1, 2001, but we

24              know it's Dr. Von Ertfelda's records.

```
 1              "Dr. Shapiro noted her MRI and

 2          x-ray showed degenerative changes and

 3          that the employee had an inordinate

 4          amount of discomfort which she felt to

 5          be related to her depression.

 6              "Employee's exam findings were

 7          similar with Dr. Johnson's.  She has

 8          limited range of motion in extremities

 9          and her back, but her sensation, motor,

10          and reflexes are normal.

11              "Both attending physicians have

12          noted employee's history of depression.

13          Dr. Shapiro noted it may be related to

14          her pain.  However, employee indicated

15          in her interview that it is not.

16              "In conclusion, medical

17          information does not indicate a change

18          in the employee's condition at the time

19          she ceased working on August 30, 2002.

20              "Restrictions and limitations from

21          Dr. Johnson and Dr. Shapiro are

22          excessive.  Considering employee's

23          clinical findings which are

24          degenerative disk disease, it is
```

```
 1            reasonable that the employee may have

 2            limitations for heavy manual work

 3            involving heavy or repetitive lifting

 4            due to the degenerative changes and her

 5            age."

 6                 And at that point, the

 7            consultation was closed.  So it's based

 8            on Miss LaBerge's medical review of

 9            those findings that those restrictions

10            and limitations do not match the

11            physical findings and the diagnostic

12            testing.

13       Q.  (By Mr. Feigenbaum)  That's the conclusion,

14   but what -- what is -- why is Dr. -- why was

15   Dr. Shapiro's opinion wrong of Miss Christie and Miss

16   LaBerge is correct?

17                 MS. PARSONS:  Objection.

18                 THE WITNESS:  Well, actually, it's

19            Dr. -- again, she references Shapiro,

20            but it's Dr. -- what's his name here --

21            Dr. Von Ertfelda who basically in all

22            his records that began in June of 2001

23            up to when he last saw her, and again,

24            I'm on page 70 going through page 75,
```

1           and it looks like his treatment ended

2           in February of 2002, but basically he

3           was encouraging her to get back to

4           work.

5       Q.   (By Mr. Feigenbaum)  I understand that, but

6    and there's no dispute that Miss Christie went back

7    to work between February 2002 and August of 2002.  So

8    why is Miss LaBerge relying on records of Dr. -- how

9    do we pronounce it -- Von Entra...

10      A.   It's Von Ertfelda.

11      Q.   Von Ertfelda when Dr. Johnson is the one who

12   made the current diagnosis?

13      A.   Well, again, the information is based on the

14   claimant's functionality, like what happened leading

15   up to August 30, 2002 when Miss Christie wasn't able

16   to continue working at that point.  So it's looking

17   at the totality of that information, which we'd look

18   at the history of the motor vehicle accident, the

19   treatment provided up to that, and what happened when

20   she ceased working.

21      Q.   So it's CNA's position that Dr. Johnson's

22   opinion was wrong and Miss LaBerge's is correct?

23           MS. PARSONS:  Objection.

24      Q.   (By Mr. Feigenbaum)  Is that stated

1     succinctly?

2          A.  Well, no, CNA's opinion was that Dr. Johnson,

3     I mean, he did state that Miss Christie's totally

4     disabled and unable to work, but we don't make our

5     decisions based on a doctor's statement.  We have to

6     look at the medical and diagnostic findings to

7     support that statement.  And that's where the dispute

8     lies.

9          Q.  What -- what -- did CNA ever advise Miss

10    Christie she needed to provide diagnostic proof that

11    her pain was debilitating?

12         A.  Well, in the proof of loss provision.

13         Q.  Not in the policy.  Was she ever sent a

14    letter saying you need to provide diagnostic testing

15    proving that your pain is debilitating as you claim?

16         A.  Well, the notice that she was provided, it's

17    on page 77, Mr. McFadden's acknowledgment letter of

18    December 11, 2002, at which time he says, "At this

19    time, additional information is necessary concerning

20    the details of your medical condition.  We need for

21    you to provide us with copies of your medical

22    records."  So at that point, we are saying we need --

23    it doesn't say diagnostic and office visits, but

24    medical records does consist of that.

1      Q.  But how is Miss Christie supposed to know

2   that CNA required that she provide either laboratory

3   or diagnostic proof to substantiate the pain that she

4   was suffering?

5      A.  Well, actually, in Mr. McFadden's

6   conversation with Miss Christie on page 80, he

7   basically told her.

8      Q.  What did he tell her exactly?

9      A.  He says, "I told Miss Christie that I have

10   received Dr. Johnson's records since September '02

11   and there was not a lot there with regard to what was

12   causing her back pain."

13      Q.  You'll agree with me that doesn't reflect

14   that he said to Miss Christie in substance you need

15   to provide diagnostic or laboratory testing

16   substantiating the pain that you're reporting.  Is

17   that correct?

18           MS. PARSONS:  Objection.

19           THE WITNESS:  Well, correct, he

20       says you need to produce the office

21       records.

22      Q.  (By Mr. Feigenbaum)  Did CNA have a reason to

23   conclude that Dr. Johnson was lying to CNA?

24           MS. PARSONS:  Objection.

1             THE WITNESS:  Well, nobody accused

2          Dr. Johnson or thought Dr. Johnson was

3          lying.

4      Q.  (By Mr. Feigenbaum)  Well, didn't Dr. Johnson

5   also write a very simple letter saying that Miss

6   Christie could not work, which is it's in the file,

7   page 98?

8      A.  Correct.  He sent a letter which is on page

9   98.  He says, "I evaluated Miss Christie in my office

10   today."  He dated that letter September 20, 2002.

11   "And find her to be disabled secondary to injuries

12   sustained in motor vehicle accident on April 12,

13   2001.  Should you have any questions or require

14   additional information, please contact my office,"

15   which CNA did.

16      Q.  Does CNA have a written record of a

17   conversation with Dr. Johnson?

18      A.  No.

19      Q.  So how do you know that Dr. Johnson was

20   contacted?

21      A.  Well, the fax from Betty Cameron to his

22   office asking for all the office notes.

23      Q.  Did anyone at CNA speak to Dr. Johnson?

24      A.  No.

```
 1        Q.  Why not?

 2        A.  Because typically the nurse case manager will

 3   obtain the medical records, and should there be any

 4   questions of those records, they could then contact

 5   the doctor.

 6        Q.  But Mr. McFadden completely disagreed after

 7   consulting with the nurse with Dr. Johnson's opinion.

 8   Don't you think it would have been fair to have

 9   someone at CNA talk to Dr. Johnson and say to him in

10   substance could you explain why Miss Christie can't

11   work; we think she can?

12             MS. PARSONS:  Objection.

13             THE WITNESS:  No, again, we rely

14        on the medical records that are

15        provided.  If the medical records were

16        not clear which includes the physical

17        examination, there is diagnostic

18        testing attached, the nurse case

19        manager reviewed that information.

20             And even though our opinion was in

21        dispute with Dr. Johnson, the

22        information they presented did not

23        support a functional loss or

24        impairment.
```

1       Q.  (By Mr. Feigenbaum)  But my question is don't

2    you think it would have been fair in evaluating the

3    claim to have someone at CNA speak with Dr. Johnson?

4            MS. PARSONS:  Objection.

5            THE WITNESS:  No, again, I think

6         the records speak for themselves.

7       Q.  (By Mr. Feigenbaum)  What does that mean, the

8    records speak for themselves?

9       A.  The physical examination, the MRI's, any

10   testing done.  Physical examination showed no sensory

11   loss, no muscle loss, no atrophy, no neurological

12   deficits.

13      Q.  Could you explain to me how muscle loss

14   correlates with pain?

15           MS. PARSONS:  Objection.

16           THE WITNESS:  Well, again, if

17        somebody is experiencing such

18        debilitating pain that they're not able

19        to function whatsoever, you're gonna

20        expect that there's gonna be some

21        muscle loss.  There's gonna be some

22        atrophy.  They're not gonna be able to

23        move whatsoever.  They're essentially

24        gonna be bedridden maybe at some point.

1      Q.  (By Mr. Feigenbaum)  Am I correct that on --

2  when Dr. Johnson examined Miss Christie on September

3  20, 2002 that he remarked in his note she had a very

4  limited range of motion?

5      A.  Right, to the extremes.

6      Q.  What does that mean, to the extremes?

7      A.  Well, she could only bend -- I have to look

8  at the actual note, but it was like five degrees.

9  And let's see.  On, okay, it's on page 84.  And in

10  the physical examination he does say, "She has very

11  restricted range of motion.  She bends backward only

12  five degrees.  She really cannot even get up to

13  neutral."

14          You know, that's -- that's pretty

15  significant, but yet if she has, you know, gait and

16  station are antalgic which is painful, but that she

17  has normal sensory examination, there's normal motor

18  strength in the lower extremities, that doesn't

19  correlate with somebody that maybe, yes, it hurts

20  that day and I'm not gonna be able to bend back that

21  far.

22      Q.  Normal sensory, that just means her reflexes

23  work.  Isn't that true?

24      A.  Right.  There's no neurological deficits.

1    Q.  Do you have to have neurological deficits to

2    experience pain?

3              MS. PARSONS:  Objection.

4              THE WITNESS:  No.

5    Q.  (By Mr. Feigenbaum)  You also said in her

6    lower extremities she had we'll call it regular

7    muscle strength?

8    A.  Right.  She has full muscle strength.

9    Q.  Isn't that just a test where the doctor, for

10    example, puts his hand on a person's right knee and

11    says push?

12    A.  Well, there's a variety of tests that are

13    done, but usually they'll have them heel, toe, walk.

14    They observe how you're coming in and out of the

15    office, getting on and off the examination table.

16    Q.  And strength, are you saying that because

17    Miss Christie did not show a loss of strength in her

18    lower extremities, she could not have been suffering

19    back pain?

20              MS. PARSONS:  Objection.

21              THE WITNESS:  No, I'm not saying

22         that.

23    Q.  (By Mr. Feigenbaum)  Now, if CNA had

24    concluded that Dr. Johnson's opinion was correct and

```
1      Nurse LaBerge's opinion was incorrect, was Miss

2   Christie entitled to be paid benefits?

3                  MS. PARSONS:  Objection.

4                  THE WITNESS:  I mean, I'm not sure

5           what you're asking.

6      Q.  (By Mr. Feigenbaum)  Well, if CNA credited

7   Dr. Johnson's opinion of September 20, 2001 and the

8   opinion set forth on the physical capacities form of

9   October 20 or 21, 2002, both dates should have been

10  2002, should CNA have paid benefits to Miss Christie?

11                 MS. PARSONS:  Objection.

12                 THE WITNESS:  Well, if CNA had

13          felt that the physical findings

14          supported Dr. Johnson's opinions and

15          restrictions and limitations and was in

16          agreement with that information, then

17          yes, the claim would have been

18          approved.

19     Q.  (By Mr. Feigenbaum)  So the reason, just so

20  it's clear, the reason that CNA did not pay Miss

21  Christie's claim was because Miss LaBerge formed an

22  opinion that was different than Dr. Johnson and CNA

23  elected to rely on Miss LaBerge's opinion rather than

24  Dr. Johnson's?
```

1          MS. PARSONS:  Objection.

2          THE WITNESS:  Well, now, wait a

3     minute.  What we want to look at is the

4     nurse case manager referral that Tom

5     McFadden made.  Okay.  On page 56.  And

6     specific questions that Mr. McFadden

7     asked of the nurse case manager who was

8     Patricia LaBerge is, "Please review

9     medical records that have been obtained

10    in claim file.

11       "Based on this information, is

12    there any evidence of a change to the

13    claimant's condition when she ceased

14    work September '02 compared to her

15    condition in 2001.

16       "The new attending physician who

17    treated her September 2002 advised that

18    she was totally disabled following a

19    motor vehicle accident April '01.  We

20    now have 2001 through 2002 medical

21    notes.  Would the 2001 restrictions be

22    reasonable and permanent."  So he's

23    asking specifically is this supported.

24   Q.  (By Mr. Feigenbaum)  Do you think that was a

```
 1    fair question?

 2              MS. PARSONS:  Objection.

 3              THE WITNESS:  Yes.

 4         Q.  (By Mr. Feigenbaum)  Even though Mr. McFadden

 5    knew that Miss Christie had returned to work between

 6    February of 2002 and August of 2002 and that he was

 7    now telling the reviewing nurse that she was

 8    allegedly disabled as of April 2001?

 9              MS. PARSONS:  Objection.

10              THE WITNESS:  Well, no,

11         Mr. McFadden is also referencing

12         Dr. Johnson.  Dr. Johnson is the one

13         who's saying she's been disabled since

14         her 2001 motor vehicle accident.

15         Q.  (By Mr. Feigenbaum)  But we know she went

16    back to work.  Correct?

17         A.  Correct.

18         Q.  So did CNA conclude that Dr. Johnson wasn't

19    credible?

20              MS. PARSONS:  Objection.

21              THE WITNESS:  No, again,

22         Mr. McFadden is asking the nurse to

23         review Dr. Johnson's information; does

24         it support the restrictions and
```

1           limitations that have been imposed.

2       Q.  (By Mr. Feigenbaum)  At what date?

3       A.  Well, he says the 2001 restrictions be

4    reasonable and permanent, but there was also

5    restrictions in 2002.

6       Q.  Right.  Dr. Johnson's provided restrictions

7    on September 20, 2002 and as well as October 21,

8    2002?

9       A.  Right.

10      Q.  When did -- have you ever seen Exhibit 2

11   prior to reviewing the file?

12      A.  Yes.

13      Q.  When did you first see that?

14      A.  This actually is my handwriting down here.

15   Received April 8, 2005.  And my initials.  So that

16   would have been when I received it.

17      Q.  Did you ever look at the CD-ROM that

18   accompanied that letter?

19      A.  No.

20      Q.  Why not?

21      A.  At that point, the claim file had been

22   closed.

23      Q.  Why didn't The Hartford or CNA respond to

24   Exhibit 2?

1      A.  Because our position was that the claim file

2   had been closed in April 2003.

3      Q.  Any other reasons that The Hartford or CNA

4   didn't respond?

5      A.  No.

6      Q.  Have you ever looked at, up to the current

7   time, have you ever looked at all the medical

8   documents that were on that CD-ROM?

9      A.  No.

10      Q.  Is there a particular reason you didn't?

11      A.  No, once the claim went into litigation, the

12   CD-ROM was attached to this letter and everything was

13   sent.  I never looked at the CD-ROM.  Just remember

14   acknowledging by my initials here this letter, but

15   actually probably did not even review the letter.

16      Q.  How did you receive the letter since it was

17   sent to Hartford, Connecticut?

18      A.  Right.  It might have been through an in --

19   well, I don't know if it's so much interoffice

20   mailer, but it probably came through a Hartford

21   envelope just to my attention.

22      Q.  Let me show you a document that's been marked

23   Exhibit 3.  Have you ever seen that before?

24      A.  Yes.

1     Q.   When did you receive that?

2     A.   Well, this was April 8th.  It was a note from

3   our clerk, Cathy Reyes.  I had requested that she

4   obtain this claim file for me.

5     Q.   Why did you ask her to get that claim file?

6     A.   Because I was gonna associate the information

7   that came, this that came with it to the claim file.

8     Q.   What's the reason you never read then Exhibit

9   2?  I'm sorry, is there any reason you didn't read

10   Exhibit 2 other than that you said the claim file was

11   closed?

12     A.   Right.  Well, we get post appeal

13   correspondence pretty frequently.  And you know,

14   typically we associate it to the claim file.  So at

15   that point, the claim had been closed in 2003 and I

16   receive a letter two years later, so I was just gonna

17   associate it to the claim file.

18     Q.   Do you think CNA had an obligation to respond

19   to Exhibit 3?

20          MS. PARSONS:  Objection.

21          THE WITNESS:  Well, again, our

22      position was the file was closed.

23     Q.   (By Mr. Feigenbaum)  I understand that's

24   CNA's position.  Do you think under Massachusetts law

1    CNA had an obligation to respond to the file?

2              MS. PARSONS:  Objection.

3         Q.  (By Mr. Feigenbaum)  Respond to the -- to the

4    -- she's making legal decisions all the time, so you

5    can answer it.

6              MS. PARSONS:  She can't discuss

7              Chapter 93A.  She's not a Massachusetts

8              attorney.  She's not an attorney,

9              period.

10        Q.  (By Mr. Feigenbaum)  Well, let me ask.  Let's

11   be fair about this.  Do you make legal decisions?

12        A.  No.

13        Q.  What do you consider a decision, for example,

14   with an appeal of a claim when it's denied?  Are you

15   not applying facts to the law?

16        A.  No.

17        Q.  What are you doing?

18        A.  I'm applying the policy and the evidence

19   which is the claim file, the medical records

20   contained in the claim file, was the claim decision

21   appropriate to the policy provision.

22        Q.  Is that a legal decision?

23        A.  No, it's a claims decision.

24        Q.  Is there anyone at The Hartford or CNA that

1    can explain other than what you've told me why The

2    Hartford or CNA did not respond to Exhibit 3?

3         A.  No.

4         Q.  Did you discuss Exhibit -- I'm sorry, I keep

5    referring to Exhibit 2.  Exhibit 2 is the letter.

6         A.  Right.

7         Q.  Can you explain -- is there anyone else at --

8    is there anyone other than you at The Hartford or the

9    CNA can explain that no response to Exhibit 2 was

10   made?

11        A.  No.

12        Q.  Is that a decision you made on your own?

13        A.  Yes.

14        Q.  Did you discuss it with anyone else before

15   you elected not to respond?

16        A.  No.

17        Q.  Did you communicate with anyone in writing as

18   to whether or not CNA or The Hartford should respond

19   to that letter?

20        A.  No.

21        Q.  Let me show you a document that's been marked

22   Exhibit 5.  Have you ever seen that before?

23        A.  Yes.

24        Q.  What is that?

1        A.  This is a printout of our disability claims

2    system, and this is what would be called the claims

3    analysis record that was kept online.

4        Q.  When was this printed out?

5        A.  This was printed on August 17, 2005.

6        Q.  Why was it printed on August 17, 2005?

7        A.  We might have received notice of the

8    litigation.  And the clerk would print out everything

9    including online for the claim file.

10       Q.  Does -- host is followed by numbers and

11   letters.  Does that identify a person?

12       A.  I'm sorry, what?

13       Q.  What do the letters and numbers following

14   host mean?

15       A.  Oh, you mean -- now, that, I don't know what

16   that is.  I think it's just associated with a

17   computer.

18       Q.  What does user mean?  It's followed by

19   letters and numbers.

20       A.  That's probably the person who printed out.

21   We all have a user ID.  And it's probably the clerk

22   that printed out this.  Her ID.

23       Q.  Do you see in the lower left it says "status

24   change from open to closed"?

1        A.   Yes.

2        Q.   Where does the next sentence go across?  I

3   mean, does it go down or across?

4        A.   Actually, I think these read like if you read

5   from the bottom going up, looks like the last action

6   was on June 17, 2003 by Tom McFadden when he probably

7   closed the file from open to closed status on the

8   claim system.

9        Q.   What does that mean to go from open to closed

10   status?

11        A.   It may have been still showing as an open

12   claim on the claim system.  Like if you actually look

13   at the notes beginning on 11/14/2002, says nurse case

14   manager review, and it goes on down to March 11,

15   2003, customer service.  The claim system will have

16   like if a claim is still in open status on the claim

17   system.  And it looks like Mr. McFadden had closed it

18   out.  And he may have even though the claim was

19   officially denied and upheld on appeal, he probably

20   didn't close it out on the computer system until June

21   17, 2003.

22        Q.   Who made the first entry on 11/14/2002?

23        A.   I believe that was system generated when it

24   says system.  The system was set like a diary of

1    notification of a new claim.

2        Q.   Who's the human, though, that did that?

3        A.   There was a claims setup team, but I don't

4    know that there's any one particular person.  There's

5    nothing in the claim file to identify who that would

6    be.

7        Q.   What is that entry on the same line that says

8    2/03/2003 Thomas McFadden?  What is that entry?

9        A.   Oh, you mean the -- I'm sorry, what date?

10       Q.   Well, if I go -- I started with November 14,

11   2002.  If I read across horizontally, is that the

12   next entry or should this be read down?

13       A.   Read down.  The entry across just associates

14   all those fields to that entry.

15       Q.   Who is Dawn Morris?

16       A.   She is customer service, I believe.

17       Q.   And who is Lindsey Staup, S-T-A-U-P?

18       A.   Again associated with customer service.

19       Q.   Are there other fields that were behind

20   what's showing on this printout that's Exhibit 5?

21       A.   No.

22       Q.   Are there -- what other information could we

23   access through this computer system relating to Miss

24   Christie's claim?

1          A.   I believe on Miss Christie's claim, this is

2     all -- the clerk prints out everything that's online,

3     and this is all that prints out.   Some letters were

4     done online.   Some conversations such as

5     Mr. McFadden's handwritten notes, some adjusters had

6     put them online.   In Mr. McFadden's case, his are

7     contained within the claim file.

8          Q.   How do you know that Mr. McFadden never made

9     any online notes relating to Miss Christie's file?

10         A.   Because they would show up on this printout

11    that we're looking at and then the actual note that

12    was typed up would be attached to this.

13         Q.   What does the, under status, what does the

14    term final mean?

15         A.   Final just means that's a final decision.

16    It's been, you know, that's when the claim decision

17    was made and finalized.

18         Q.   What is the difference between final and

19    closed?

20         A.   Well, closed is usually there's like an open

21    status on the claim.   And in other words, customer

22    service, if they sent an action item such as that

23    e-mail or something like that, they would have an

24    open status until Mr. McFadden actually addressed the

124

1    information and closed it out on the system.

2        Q.  Did CNA have any reason to believe that

3    Dr. Johnson was not a competent medical doctor?

4            MS. PARSONS:  Objection.

5            THE WITNESS:  No.

6        Q.  (By Mr. Feigenbaum)  I wanted to ask you some

7    questions about the claim file.  If you look at page

8    33, why is there a reference to ERISA?

9        A.  Well, it says "ERISA to the" -- well, let's

10   see, page 33 says, "Discretionary authority, the

11   policy is delivered in and is governed by the laws of

12   the governing jurisdiction and to the extent

13   applicable by the Employee Retirement Income Security

14   Act of 1974, ERISA, and any amendments to it."  And

15   CNA used language "extent applicable."  It doesn't

16   mean that ERISA applied or it didn't apply.  It was

17   just a company decision.

18       Q.  What's a company decision?

19       A.  Well, it was a business decision by the

20   company that was writing policies that they would

21   have "ERISA to the extent applicable" in their

22   certificates and in their policy language.

23       Q.  Do you think that language had the effect of

24   misleading Miss Christie to believing her claim was

1    governed by ERISA rather than the state law?

2              MS. PARSONS:  Objection.

3              THE WITNESS:  Well, again, it was

4              just, you know, at the claims level and

5              during the claims level that language

6              was prevalent.  And that was at the

7              direction of the company.

8              At the appeals level, we would not

9              include that type of language, but we

10             did get questions, and I think it

11             could, you know, be construed

12             differently.

13   Q.  (By Mr. Feigenbaum)  Would you agree that

14   that could be construed as misleading to a

15   policyholder?

16             MS. PARSONS:  Objection.

17             THE WITNESS:  Well, again, it says

18             "to the extent applicable."  So if it

19             applies, we're saying ERISA applies.

20             If it doesn't, then it doesn't apply.

21   Q.  (By Mr. Feigenbaum)  Why would CNA not then

22   say we'll pay you a hundred thousand dollars a month

23   if that provision is in your policy if it applies?

24             MS. PARSONS:  Objection.  All

1          beyond the scope.

2                    THE WITNESS:  Again, I can only

3          speak to what the language says and

4          what's written.

5     Q.  (By Mr. Feigenbaum)  Who were the members of

6     the appeals team that reviewed Miss Christie's claim?

7     A.  It would be Nancy Deskins.

8     Q.  So she was the only person?

9     A.  Yes.

10     Q.  And what analysis did she perform in

11     reviewing Miss Christie's claim?

12     A.  She would have reviewed the entire claim file

13     and the policy.  And then her letter speaks to the

14     conclusions and the results of her review.

15     Q.  When you spoke to her the other day, did you

16     ask her and say did you review Miss Christie's entire

17     claim file before you rendered a decision?

18     A.  I asked her was there anything outside of the

19     claim file and the policy that she reviewed, and she

20     said no.

21     Q.  Did she have a memory of ever reviewing Miss

22     Christie's file?

23     A.  Not specific, no.

24     Q.  When you say not specific, did she somehow

1    generally imply that she had reviewed it?

2         A.  Well, based on her letter of April 25, 2003,

3    that's her recollection.

4         Q.  So you're saying Miss Deskins' best

5    recollection is set forth in her letter of April 25,

6    2003?

7         A.  Yes.

8         Q.  And that letter would have her best

9    recollection of the analysis she performed?

10        A.  Yes.

11        Q.  If we turn to the second page, page 35, at

12   the top it says, "Based on our review of Miss

13   Christie's file in its entirety."  Who is the our

14   that is being, O-U-R, that is being referred to?

15        A.  The company.

16        Q.  Well, who at the company did the review that

17   she -- that Miss Deskins is referring to?

18        A.  It's Miss Deskins.  And she's speaking, when

19   we say we or our, we're speaking on behalf of the

20   company, but it's Miss Deskins' review.

21        Q.  Why is the letter not signed?

22        A.  Typically we didn't keep a signed copy within

23   the claim file.  We just print it and we just sign

24   the copy that went to the whoever it was mailed to.

128

1    The claimant or the representative.

2        Q.   During the time period that Miss Christie's

3    file was open, I mean, literally, could Miss Deskins

4    print a letter from her desk and pick it up or did

5    the letters print in another office or --

6        A.   No, they printed right within the claims

7    office and where we're located.

8        Q.   Could you -- Dr. Brick's report, that's

9    contained on page 39 and 40.  Did anyone at CNA ever

10   speak to Dr. Brick?

11       A.   No.

12       Q.   Is there a particular reason why no one at

13   CNA spoke with Dr. Brick?

14       A.   No.

15       Q.   Is there anything in Dr. Brick's report that

16   conflicts with Miss Christie's claim of reported

17   pain?

18       A.   No.

19       Q.   If you turn to page 41, you see a bone scan

20   of a radiological report by Dr. -- Dr. Streeter?

21       A.   Yes.

22       Q.   Is there a particular reason that CNA did not

23   order any records from Dr. Streeter?

24       A.   No.

1      Q.   In evaluating the claim, do you think it

2   would have made sense to order documents or medical

3   reports from Dr. Streeter?

4              MS. PARSONS:   Objection.

5              THE WITNESS:   No.

6      Q.   (By Mr. Feigenbaum)   I think earlier you told

7   me that based on Exhibit 5, if there were computer

8   generated claim notes, they would show up on that

9   screen?

10      A.   Correct.

11      Q.   And then if you look in Exhibit -- the claim

12   file, what is that?   Exhibit 1?

13      A.   4.

14      Q.   I'm sorry.   If you turn to page 54, does that

15   appear -- page 54 and 55 which are records of Miss

16   LaBerge.   Do those appear to be generated from a

17   computer system?

18      A.   They look to be like a Word document that

19   probably was saved on this particular sheet of paper.

20      Q.   Why do you think that's a Word document?

21      A.   Because the way it's written and typed out.

22   There was a nurse case manager database.   That

23   doesn't look like it pertained in this claim.   That

24   would have been something on the system, but this is

1    not written the same way.

2        Q.  So why are the notes -- I'm not following

3    you.  Why are the notes that are page 54 and 55 not

4    showing up on the screen that's Exhibit 5?

5                MS. PARSONS:  Objection.

6                THE WITNESS:  Well, because the

7                nurse case managers did not type up on

8                the disability claim system.  Typically

9                all they would have is just like this.

10               Nurse case manager review system

11               generated diary.  And that would be it.

12       Q.  (By Mr. Feigenbaum)  So in what system were

13   the typed notes that are Exhibit 4, pages 54 and 55

14   maintained?

15       A.  Looks like a Word document.  I don't know if

16   they're maintained anywhere or just for the claim

17   file.

18       Q.  During the time period that Miss Christie's

19   file was open, are you saying that note may have been

20   prepared and then deleted after it was printed?

21       A.  Well, I don't know if it was deleted, but...

22       Q.  How is it maintained then?

23       A.  Well, a copy was printed out.  I can't speak

24   for Miss LaBerge, but the nurses would have usually a

1    claim database which may not have been available in

2    2003.  And so they would type their documents up on

3    the Word document and print it out for the claim

4    file.

5         Q.  What is the claim database you're referring

6    to?

7              MS. PARSONS:  Objection.

8              THE WITNESS:  In 2001, and it may

9              have ended by 2003, I'm not specific of

10             the time, but there was a separate it

11             was called a nurse case manager

12             database which looked somewhat similar

13             to the claims analysis record, but just

14             a little different format.

15             And it would be like computer

16             online notes that nurse case managers

17             would be able to access and type their

18             records and print it out for the claim

19             file because the claims folks were not

20             up on that system.

21        Q.  (By Mr. Feigenbaum)  If you could go to page

22   59 which is Dr. Johnson's records, I just have a few

23   more questions on it.  Do you see that three-quarters

24   down the page there is a one sentence that says she

1    is on Amitriptyline, A-M-I-T-R-I-P-T-Y-L-I-N-E, for

2    depression?

3        A.  Yes.

4        Q.  Did anyone at CNA ask Miss Christie who was

5    prescribing that medication?

6        A.  I know in Mr. McFadden's interview with Miss

7    Christie on page 80, in the middle of the page, he

8    doesn't ask specifically about who prescribed, but he

9    said, "Since Miss Christie does seem a little

10   emotional and teary during our conversation and the

11   medical notes mention that she's depressed, I asked

12   her about psychiatric treatment.  She said she saw a

13   psychiatrist years ago, but isn't seeing one now and

14   it is due to physical reasons that she can't work."

15   That's the only notation I see regarding that.

16       Q.  So it's correct to say that no one asked Miss

17   Christie or any of her doctors who was prescribing

18   Amitriptyline for her?

19               MS. PARSONS:  Objection.

20               THE WITNESS:  Correct.

21       Q.  (By Mr. Feigenbaum)  Also on page 59 at the

22   top, you'll see a reference to a Jeannie Crabtree.

23   Do you see that?

24       A.  Yes.

1       Q.   Referring physicians?

2       A.   Yes.

3       Q.   Why was Miss Crabtree not contacted by CNA?

4       A.   I don't know.

5       Q.   If you turn to page 67, see in the middle of

6    the page it says Dr. Doug Johnson with an address at

7    Charlton Hospital, C-H-A-R-L-T-O-N?

8       A.   Yes.

9       Q.   What was the reason that CNA did not seek to

10    obtain records from Charlton Hospital regarding Miss

11    Christie?

12              MS. PARSONS:   Objection.

13              THE WITNESS:   Well, the request

14         was made to Dr. Johnson for his

15         records.

16       Q.   (By Mr. Feigenbaum)   My question is why was

17    not a request made of Charlton Hospital for all of

18    Miss Christie's records at that facility?

19       A.   Because again we're going to the primary care

20    doctor that she was seeing, and that just indicated

21    where his address was.

22       Q.   Why do you call Dr. Johnson a primary care

23    doctor?

24       A.   Well, because on the claim form, it says,

1      "List primary physicians you consulted because of

2      this disability.  Please attach a separate sheet of

3      paper if necessary."  And at the time of Miss

4      Christie's claim submission, Dr. Doug Johnson was the

5      only doctor listed.

6          Q.  If you turn to page 68, Dr. Johnson never

7      says in his letter that she was disabled effective

8      April 12, 2001.  Is that correct?

9                    MS. PARSONS:  Objection.

10                   THE WITNESS:  Well, no, he's just

11                   saying based on his evaluation of

12                   September 20, 2002 that he finds her to

13                   be disabled secondary to injuries

14                   sustained in the motor vehicle accident

15                   on April 12, 2001.

16         Q.  (By Mr. Feigenbaum)  I think you told me

17     earlier one of the reasons -- strike that.  To be

18     very clear, Dr. Johnson was providing a disability

19     opinion effective September 20, 2002.  Is that

20     correct?

21                   MS. PARSONS:  Objection.

22                   THE WITNESS:  Correct.

23         Q.  (By Mr. Feigenbaum)  If you turn to page 70,

24     do you see in the first paragraph there's a reference

```
 1    to a Saint Ann's Hospital?

 2         A.  Yes.

 3         Q.  Why didn't CNA order any records from Saint

 4    Ann's Hospital?

 5         A.  I don't know.

 6         Q.  Do you see the next sentence down there's a

 7    reference to Coastal Orthopedics?

 8         A.  Yes.

 9         Q.  Why didn't CNA order any records from Coastal

10    Orthopedics?

11         A.  I don't know.

12         Q.  Now, if you turn to page 74, there's medical

13    notes from Dr. Von Ertfelda.

14         A.  Okay.

15         Q.  Do you see a reference at the bottom

16    handwritten 1/7/02, looks like it says "CC Dan

17    Moriarty, CMS"?

18         A.  Right.

19         Q.  Were any records ordered from Dan Moriarty?

20         A.  No.

21         Q.  Do you know why?

22         A.  No.

23         Q.  If you turn to page 90, is that a CNA

24    document?
```

1     A.  Yes.

2     Q.  Explain to me what that document is.

3     A.  It's a -- the label of it is LTD National

4  Standalone Assignment Sheet.  And it was a form that

5  was completed by the IMS intake, I think it's intake

6  medical specialist, but I forget the acronym or

7  whatever it officially stands for.  But the case

8  would be screened.  The claim would be screened and

9  then assigned to the appropriate parties to review.

10     Q.  What is the number in the upper left at the

11  top, ████████████     Does that look like a social

12  security number?

13     A.  Yeah, looks like a social.  I don't know if

14  that's Miss Christie's social or not.

15     Q.  What is the number on the right side that

16  says C771225NS?

17     A.  I believe that probably is the computer ID

18  number of the person on the intake sheet that

19  probably physically received the claims as they came

20  through.

21     Q.  And you told me what the coding means in the

22  middle.  If you skip down, NCM signoff, it says DBS.

23  Does that stand for disability specialist?

24     A.  Yes.

1        Q.   And Tom is Tom McFadden?

2        A.   Yes.

3        Q.   What is the number in the lower right,

4    83130411?

5        A.   It looks like a policy number.  I'm not sure.

6    Policy number for the Commonwealth of Massachusetts.

7        Q.   Can you explain if you look at page 93,

8    you'll notice that Miss Christie's release is dated

9    9/30/02?

10       A.   Yes.

11       Q.   Is that about the time that CNA first

12   received notice of a claim or is that inconsistent?

13            MS. PARSONS:  Objection.

14            THE WITNESS:  Actually, CNA

15            received notice of the claim on

16            November 14, 2002.  But if you look at

17            page 99, this is just a faxed copy.

18            Page 93 is a faxed copy of the bottom

19            of page 99 which is Miss Christie's

20            application for the benefits and

21            signing of the authorization.

22       Q.   (By Mr. Feigenbaum)  Let me ask you.  If you

23   turn to page 96, is that a complete physician's

24   statement?

1      A.   There should be a back page.  Usually the

2   attending physician's statement is a two-sided form.

3      Q.   And usually it has a signature on it?

4      A.   Right.  The back page would typically have

5   that.

6      Q.   Do you have any explanation for CNA why that

7   back page is missing?

8           MS. PARSONS:  Actually, could we

9        go off the record?

10           MR. FEIGENBAUM:  Sure, sure.

11           (Off the record.)

12      Q.   (By Mr. Feigenbaum)  If you turn to pages 101

13   through 103, does CNA have any reason to believe that

14   that is not an accurate occupational description of

15   Miss Christie's job as an assistant to the housing

16   manager?

17      A.   No, I don't think there's any indication.  I

18   mean, there is some handwritten notes that I'm not

19   sure who wrote that on there.  But as far as the job

20   description, it does appear to match what the

21   employer was describing.

22      Q.   Is there a difference between job description

23   and occupation?

24      A.   Well, a job description -- occupation is

1    usually much more broader.  Like an occupation can

2    encompass a clerk, but a job description could go

3    into more details as to what type of clerk you are.

4        Q.  To the left of me, there's about eight

5    hundred pages of documents that have been produced so

6    far in this litigation.  Have you ever looked at

7    those?

8        A.  No.

9        Q.  After reviewing -- after spending, you know,

10   detailed -- strike that.  Strike that.  How many

11   hours did you spend reviewing Miss Christie's claim

12   file?

13       A.  About four hours.

14       Q.  And is there any particular reason -- strike

15   that.  When you say you reviewed it four hours, that

16   was for preparation of today.  Correct?

17       A.  Correct.

18       Q.  During the time period that Miss Christie's

19   claim file was open, was Mr. McFadden required to

20   track his time?

21              MS. PARSONS:  Objection.

22              THE WITNESS:  Not that I'm aware

23          of.

24       Q.  (By Mr. Feigenbaum)  Were you required to

1    track your time?

2            MS. PARSONS:  Objection.

3            THE WITNESS:  No.

4    Q.  (By Mr. Feigenbaum)  Are you currently

5    required to track your time?

6            MS. PARSONS:  Objection.

7            THE WITNESS:  No.

8    Q.  (By Mr. Feigenbaum)  After spending another

9    four hours reviewing Miss Christie's claim file, do

10   you believe that CNA fully and fairly reviewed her

11   claim in denying it?

12           MS. PARSONS:  Objection.

13           THE WITNESS:  Yes.

14   Q.  (By Mr. Feigenbaum)  Did you assist in

15   preparation of answers to interrogatories in this

16   case?

17           MS. PARSONS:  Objection.

18           THE WITNESS:  No, I just reviewed

19       and signed an affidavit.

20   Q.  (By Mr. Feigenbaum)  Did you take part in

21   preparing a response to admissions in this case?

22   A.   Yeah, I believe I was asked to review the --

23   an affidavit and sign to that as well.

24   Q.   A few more questions and we'll be done.  Miss

1    Christie's claim was denied during the own occupation

2    period.  We're in agreement on that.  Right?

3        A.  Yes.

4        Q.  What is the difference between the own

5    occupation definition and the any occupation

6    definition in Miss Christie's policy?

7                MS. PARSONS:  Objection.

8                THE WITNESS:  Well, the any

9                occupation would encounter if you're

10               disabled first from performing your

11               substantial and material duties of your

12               regular occupation, the policy pays for

13               a period of time.  I just want to make

14               sure I get the correct time in this

15               case.

16                   On page 18 it'll say, "During the

17               occupation qualifier, disability means

18               that during the elimination period in

19               the following twenty-four months injury

20               or sickness causes physical or mental

21               impairment to such a degree of severity

22               that you are continuously unable to

23               perform the material and substantial

24               duties of your regular occupation and

1           not gainfully employed."

2                And then what we call the any

3           occupation follows that.  It says,

4           "After the long term disability monthly

5           benefit has been payable for

6           twenty-four months, disability means

7           that injury or sickness causes physical

8           or mental impairment to such a degree

9           of severity that you are continuously

10          unable to engage in any occupation for

11          which you are or become qualified by

12          education, training, or experience and

13          not gainfully employed."

14     Q.  (By Mr. Feigenbaum)  Is there anything in the

15     CNA insurance policy that says we will only pay you

16     benefits if you can't do sedentary work or light duty

17     work or medium duty work or heavy duty work?

18                MS. PARSONS:  Objection.

19                THE WITNESS:  No.

20     Q.  (By Mr. Feigenbaum)  Is it correct to say

21     that descriptions of occupations in terms of

22     sedentary work or light duty work or medium duty work

23     or heavy duty work refer to ability to lift or move a

24     certain amount of weight?

1               MS. PARSONS:  Objection.

2               THE WITNESS:  Well, it entails a

3          variety of factors including carrying,

4          lifting, standing, walking, sitting, so

5          it's all the physical elements of an

6          occupation.

7      Q.  (By Mr. Feigenbaum)  Is it correct it doesn't

8   take into consideration things such as concentrating?

9      A.  Correct.  Usually it's based on physical.

10              MR. FEIGENBAUM:  I don't have any

11         further questions.

12              MS. PARSONS:  I don't have any

13         questions.

14              (Whereupon the deposition

15         concluded at 1:14 p.m.)

16

17

18

19

20

21

22

23

24

```
 1              ERRATA SHEET DISTRIBUTION INFORMATION

 2            DEPONENT'S ERRATA & SIGNATURE INSTRUCTIONS

 3

 4              ERRATA SHEET DISTRIBUTION INFORMATION

 5              The original of the Errata Sheet has been

 6      delivered to Katherine R. Parsons, Esquire.

 7              When the Errata Sheet has been completed by

 8      the deponent and signed, a copy thereof should be

 9      delivered to each party of record and the ORIGINAL

10      forwarded to Jonathan M. Feigenbaum, Esquire, to whom

11      the original deposition transcript was delivered.

12

13

14                  INSTRUCTIONS TO DEPONENT

15              After reading this volume of your

16      deposition, please indicate any corrections or

17      changes to your testimony and the reasons therefor on

18      the Errata Sheet supplied to you and sign it.  DO NOT

19      make marks or notations on the transcript volume

20      itself.  Add additional sheets if necessary.  Please

21      refer to the above instructions for Errata Sheet

22      distribution information.

23

24
```

1    PLEASE ATTACH TO THE DEPOSITION OF CHERYL SAUERHOFF

2    CASE:  CHRISTIE VS. HARTFORD LIFE

3    DATE TAKEN:  5/18/06

4

5                        ERRATA SHEET

6    Please refer to Page 144 for Errata Sheet

7    instructions and distribution instructions.

8    PAGE        LINE        CHANGE        REASON

9

10

11

12

13

14

15

16         I have read the foregoing transcript of my

17    deposition, and except for any corrections or changes

18    noted above, I hereby subscribe to the transcript as

19    an accurate record of the statements made by me.

20         Executed this    day of         , 2006.

21

22

23                        CHERYL SAUERHOFF

24

1    STATE OF CONNECTICUT

2    HARTFORD, SS.

3

4            I, Esmeralda Guzman, a Certified Shorthand

5    Reporter and Notary Public in and for the State of

6    Connecticut, do hereby certify that the foregoing

7    transcript of the deposition of Cheryl Sauerhoff

8    having previously been sworn on May 18, 2006, is true

9    and accurate to the best of my knowledge, skill, and

10   ability.

11           I further certify that I am not a relative

12   or employee or attorney or counsel of any of the

13   parties hereto, nor am I a relative or employee of

14   such attorney or counsel; nor do I have any interest

15   in the outcome or events of this action.

16           IN WITNESS WHEREOF, I have hereunto set my

17   hand and seal this 3rd day of June 2006.

18

19

20                           ESMERALDA GUZMAN

21

22   My Commission Expires:

23   September 30, 2010

24